UNITED STATES of America, Plaintiff–Appellee,

v.

Angelo J. CELESIA, Jr., Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee,

v.

Gilbert E. HOLT, Jr., Defendant–Appellant.

Nos. 91–5001, 91–5002.

United States Court of Appeals, Fourth Circuit.

Argued June 7, 1991.

Decided Sept. 18, 1991.

As Amended Oct. 25, 1991.

Stanley E. Sacks, Sacks & Sacks, Norfolk, Va., argued, for defendants-appellants.

Alan Mark Salsbury, Asst. U.S. Atty., Norfolk, Va., argued (Henry E. Hudson, U.S. Atty., on brief), for plaintiff-appellee.

Before ERVIN, Chief Judge, HALL, Circuit Judge, and GARBIS, District Judge for the District of Maryland, sitting by designation.

## OPINION

ERVIN, Chief Judge:

Angelo J. Celesia, Jr. and Gilbert E. Holt, Jr. appeal from their conviction for bank fraud in violation of 18 U.S.C. § 1344 and for conspiracy to commit bank fraud in violation of 18 U.S.C. § 371. We find that the evidence of record amply supports the district court's finding that Holt and Celesia, by intentionally depositing worthless checks and withdrawing funds thereon, knowingly executed a scheme to defraud a financial institution. We therefore affirm the convictions.

### I.

Appellants Celesia and Holt are partners in a construction business operating in eastern Virginia. They wholly own a Virginia corporation known as Signet Enterprises, Ltd. (Signet), which in turn is a component of a Virginia general partnership, Pear Ridge Associates. In addition, Appellants are individual partners in another Virginia general partnership, Southside Meadows Associates.

Appellants maintained a commercial checking account at Investors Savings Bank (ISB) in the name of Signet. Appellants maintained two other separate commercial checking accounts, in the names of Pear Ridge and Southside Meadows, at Trustbank Savings, a federally insured financial institution. In addition, Celesia and Holt each kept personal money market checking accounts with the brokerage firm of Dean Witter Reynolds.

On October 11 and 12, 1989, Appellants deposited eight checks totalling $610,000, drawn on their ISB Signet account, into their Pear Ridge and Southside Meadows accounts at Trustbank. $305,000 was deposited into each of these accounts. Trustbank followed its past practice of granting Appellants' deposits immediate credit, on the basis of their status as construction loan customers of several years' standing. On the same dates, eight checks totalling $610,000, which had been drawn by the appellants on the two Trustbank accounts and deposited by them into the other bank checking accounts which they controlled, were presented to Trustbank for payment. In reliance on what appeared to be a collectable balance of $305,000 in each of the two accounts, Trustbank paid these checks. In the absence of the ISB deposits, the balances in the two Trustbank accounts were grossly insufficient to cover the $610,000 worth of checks written by Appellants.

On October 13, 1989, four of the eight ISB Signet checks totalling $250,000 were presented to ISB for payment. ISB saw that on October 12, six checks totalling $410,008 had been deposited in the Signet account; however, the $410,008 had not cleared the originating accounts on which those checks had been drawn. Normally, ISB allowed Appellants' checks to clear on uncollected funds, a practice the bank followed with certain customers who did a lot of business with the bank. Because of the large amount involved in this transaction, however, ISB attempted to verify that the $410,008 was collectable and drawn on sufficient funds. Without the $410,008, the Signet account balance on October 13 was only $56,246.24.

The October 12 deposit of $410,008 consisted of three checks written on Celesia's personal money market account at Dean Witter totalling $250,000, and three checks, totalling $205,008, written on Holt's money market account with Dean Witter. Upon contacting Dean Witter ISB learned that

these checks were not good. ISB further discovered that the six worthless Dean Witter checks had been deposited on the afternoon of October 12 at three different branches of ISB in Virginia Beach, over a ninety-minute period, in an apparent effort to avoid triggering a hold and funds verification that ISB automatically conducted when presented with sizable single deposits.

Armed with this information, ISB dishonored the four checks for $250,000 that Trustbank had presented for payment. ISB notified Celesia on the morning of October 13 that it would dishonor the checks. On Monday, October 16, Celesia directed ISB to stop payment on the eight ISB checks, including the four that ISB had already dishonored. Meanwhile, Appellants took the $610,000 they had obtained when Trustbank paid the eight ISB checks and deposited the funds back into the other checking accounts which they controlled: $360,000 was deposited into Appellants' ISB Signet account, $125,000 into Holt's Dean Witter account, and $125,000 into Celesia's Dean Witter account. As the result of these transactions, Trustbank incurred a loss of $610,000.

Appellants were subsequently indicted in the Eastern District of Virginia at Newport News on one count each of bank fraud in violation of 18 U.S.C. § 1344 and conspiracy to commit bank fraud in violation of 18 U.S.C. § 371. After waiving jury trial, Appellants were tried before the district court, which found them guilty as charged on both counts and sentenced each to an 18-month term of imprisonment on each count, to run concurrently. The court also ordered each defendant to make restitution to Trustbank in the amount of $304,914.55. Celesia and Holt now appeal.

## II.

This appeal raises the question of whether check kiting constitutes a violation of the Bank Fraud Statute, 18 U.S.C. § 1344. That statute provides as follows:

Whoever knowingly executes, or attempts to execute a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations or promises; shall be fined not more than $1,000,000 or imprisoned not more than 20 years, or both.

18 U.S.C.A. § 1344 (West Supp.1991).

Congress passed the Bank Fraud Statute in 1984, in response to *Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982). In *Williams* the Supreme Court held that check kiting was not a "statement" within the meaning of 18 U.S.C. § 1014 (the bank false statement statute) and therefore did not constitute a violation of that statute. Having determined that check kiting is "one of the most pervasive forms of bank fraud," Congress wished to limit the potential exculpatory reach of *Williams.* S.Rep. No. 98–225, 98th Cong., 2d Sess. 377, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3517–19.

■ Since the enactment of the Bank Fraud Statute several courts, citing *Williams,* have nevertheless refused to find that passing worthless checks constitutes a "false representation" for purposes of Section 1344(2). *United States v. Falcone,* 934 F.2d 1528, 1540 (11th Cir.1991); *United States v. Medeles,* 916 F.2d 195, 200 (5th Cir.1990); *United States v. Cronic,* 900 F.2d 1511, 1516 (10th Cir.1990) (all holding that mere depositing of a check, without other acts or communications, is not a representation that bank account on which it was drawn has sufficient balance to cover check). Nevertheless, the courts have construed Section 1344's provisions disjunctively, so that one may commit a bank fraud under Section 1344(1) by defrauding a financial institution, without making the false or fraudulent promises required by Section 1344(2). Thus, an indictment which, like the one in the present case, tracks the language of both provisions is not dependent on proof of the (2)

elements. *United States v. Schwartz,* 899 F.2d 243, 246–47 (3d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 259, 112 L.Ed.2d 217 (1990); *see also Medeles, supra,* 916 F.2d at 197 (reversing conviction under Section 1344(2) where indictment did not allege violation of Section 1344(1)). We join those courts of appeal which have held that check kiting can constitute a "scheme or artifice to defraud" in violation of Section 1344(1). *Schwartz, supra,* 899 F.2d at 246; *United States v. Bonnett,* 877 F.2d 1450, 1454 (10th Cir.1989). *See also Falcone, supra,* 934 F.2d at 1540 n. 30; *United States v. Rafsky,* 803 F.2d 105, 107 n. 1 (3d Cir.1986), *cert. denied,* 480 U.S. 931, 107 S.Ct. 1568, 94 L.Ed.2d 760 (1987).

■ Appellants claim that they lacked intent to defraud and were merely relying on ISB's past practice of honoring drafts on uncollected funds, in effect granting them "informal loans." They maintain that the practice of floating checks is typical of the construction industry, that ISB had cooperated in this practice, and that ISB acted "suddenly and without notice" when it refused to honor the Trustbank checks.

We find the Third Circuit's decision in *United States v. Schwartz, supra,* pertinent to this argument. *Schwartz* likewise involved a defendant who had been granted immediate credit by his bank and who attempted to defend by claiming lack of intent to defraud and reliance on the bank's past practice of honoring without hold checks presented for payment. The appeals court upheld Schwartz's conviction under Section 1344 on an indictment, like Appellants', which tracked the language of both provisions. Citing *Williams v. United States,* Schwartz claimed that the mere deposit of worthless checks and withdrawal of funds before the checks were returned did not constitute a false representation for purposes of Section 1344(2). The court nevertheless found that, under Section 1344(1), the focus is on what the defendant

knew, not on what he represented, and that Schwartz knew when he made the withdrawals that he was obtaining money that was not his. 899 F.2d at 247. In response to Schwartz's claim that he relied on the bank's past practice,[1] the court noted that, despite the bank's immediate credit policy, Schwartz did not contend that the bank was aware that it was permitting withdrawals to be made on the basis of false deposits created by worthless checks. *Id.*

As did Schwartz, Appellants concede that they could not cover the checks, and they make no allegation that ISB had honored worthless checks in the past even with its immediate credit policy. Moreover, Holt admitted that other banks involved in Appellants' kiting were not aware of any credit policy Appellants had with ISB. Trustbank testified that it extended Appellants immediate credit because they were construction loan customers, and that the eight checks of October 12 were paid because the computer indicated that there were sufficient funds in the two accounts to cover them. ISB officers similarly testified that, because Appellants were construction loan customers, they had worked with Appellants in the past and paid checks on uncollected funds when they knew Appellants had a construction draw coming in. ISB acknowledged that it had even paid some checks on overdrafts, but only upon the express agreement of Appellants to cover those particular checks by a designated time on the following morning. Even though past checks had always eventually been covered, ISB felt sufficiently uneasy about Appellants' accounting practices to have requested, prior to the October transactions, that they stop drawing against uncollected funds. There was no agreement between ISB and Appellants that they could draw on uncollected funds because of their cash flow problems.

Fraudulent intent "may be established by circumstantial evidence and by inferences deduced from facts and situations."

---

1. The cases Appellants cite in support of this defense merely say that, while a general banking practice is not an absolute defense to criminality, the trial court should not exclude such evidence but should let the jury consider defendant's evidence as to the past practice in determining whether the intent to defraud existed. *United States v. Riley,* 550 F.2d 233, 236 (5th Cir.1977); *United States v. Klock,* 210 F.2d 217, 221 (2d Cir.1954). Here, the trier of fact had the evidence before him and determined that it did not raise a credible defense in this case.

*United States v. Bales,* 813 F.2d 1289, 1294 (4th Cir.1987). We review the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found this essential element of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

Significant evidence exists to negate Appellants' claim of lack of fraudulent intent. The manner in which Appellants made the deposit of the six worthless Dean Witter checks to the ISB Signet account—in three locations at three different times on the same afternoon—is telling. Upon questioning, neither Holt nor Celesia could offer a legitimate explanation for this conduct to counter the reasonable inference that they were trying to avoid arousing ISB's verification mechanism, which was triggered by very large deposits. Moreover, by October 1989 ISB's construction loan officer, who worked closely with Appellants, knew that several projects Appellants had listed with him in March had not materialized to provide the cash they needed to overcome their most recent problems. From the facts presented, the unrefuted inference arises that by kiting Appellants were attempting to artificially inflate their account balances in order to maintain their credit status with ISB by creating the appearance that funds in excess of the actual were being generated.[2] Finally, the "circle of funds" culminating in deposits to the personal accounts of Holt and Celesia indicates that they intended, not just to help their business, but to profit personally from the illegal funds they had obtained from Trustbank.

The evidence clearly supports the district court's finding beyond a reasonable doubt that Appellants' check kiting scheme violated Section 1344(1), and therefore we affirm.

AFFIRMED.

---

**2.** Appellants' former bookkeeper testified that Appellants had knowingly kited bad checks for several months prior to the collapse of the scheme in October 1989.