UNITED STATES of America, Appellee,

v.

John Robert RAGOSTA, Defendant–Appellant.

No. 417, Docket 91–1385.

United States Court of Appeals, Second Circuit.

Argued Nov. 19, 1991.

Decided July 23, 1992.

Peter F. Langrock, Middlebury, Vt. (Mitchell L. Pearl, Langrock Sperry & Wool, Middlebury, Vt., of counsel), for defendant-appellant.

John–Claude Charbonneau, Asst. U.S. Atty., Rutland, Vt. (George J. Terwilliger, III, U.S. Atty., Charles A. Caruso, Asst. U.S. Atty., Rutland, Vt., of counsel), for appellee.

Before: MESKILL, Chief Judge, KEARSE and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

John Robert Ragosta appeals from a judgment of conviction entered in the United States District Court for the District of Vermont, Albert W. Coffrin, *Judge*, after a two-day jury trial in which he was found guilty of one count of bank fraud, in violation of 18 U.S.C. § 1344.

Ragosta argues that there was insufficient evidence to support his conviction. We disagree and affirm the judgment of the district court.

## BACKGROUND

On August 15, 1990, a federal grand jury returned a one-count indictment against Ragosta charging that he

> did knowingly execute and attempt to execute a scheme and artifice to defraud the Marble Bank, a financial institution the deposits of which were then and there insured by the Federal Deposit Insurance Corporation, in that he overdrew his account at the Marble Bank and unlawfully obtained $9,220.00 in United States currency of the funds of the said

bank by making 34 separate entries into a Marble Bank automated teller machine in violation of 18 U.S.C. § 1344.

The evidence presented at trial established the following: On March 4, 1989, Ragosta applied for and was issued an automatic teller machine ("ATM") card by the Marble Bank ("Bank") in Killington, Vermont. The card permitted him to access his savings account through the Bank's ATM terminal. To access the ATM, Ragosta was required to select a four-digit personal identification number ("PIN"). It is the Bank's practice not to keep a record of its customers' PINs and, ordinarily, the customer is the only person who would be able to utilize the machine with that number.

As part of the ATM application process, Ragosta was required to read and sign a disclosure statement—this statement was received in evidence. By signing the disclosure statement, an applicant indicates to the Bank employee reviewing his application that he understands the restrictions contained in it. The disclosure statement provided, *inter alia,* that the ATM could be used to deposit and withdraw cash from the cardholder's checking or statement savings account and that up to $300 could be withdrawn from an ATM terminal within each twenty-four hour period. During the trial, it was stipulated that the Bank is a federally chartered and insured financial institution.

The jury heard testimony regarding an internal journal tape retrieved from the Bank's ATM and was shown a recording from a video camera located in the Bank's ATM. The journal tape records information about the customer's type of transaction, the number of the ATM card, the transaction number itself, and, if the transaction deals with money, the amount of money. The journal tape also registers the time when the ATM card was first inserted into the machine and when the PIN number was keyed in and accepted. If the customer performs more than one transaction, that time noted will remain the same until the card is extracted and taken away. The video tape runs continuously, recording anyone standing in front of the machine. Both the journal tape and video tape were received in evidence.

The journal tape established that on the evening of December 21, 1989, at around 7:30 p.m., an individual inserted an ATM card into the Bank's ATM terminal and queried the machine for the account's balance. Martha Baker, the Bank employee who assisted Ragosta in filling out his ATM application, testified at trial that the ATM card number noted on the journal tape was his card number. Although the journal tape itself does not reflect the information the ATM conveyed to the customer, it does reflect that a balance inquiry was made. According to bank records, Ragosta had $42.31 in his account.

The journal tape revealed that once engaged, five withdrawals of cash were made from the ATM: four were for $80, one was for $200. The journal tape further established that approximately fourteen minutes after the initial inquiry, the ATM was re-engaged and twenty-nine more cash withdrawals were made, each for $300. During the thirty-sixth transaction the ATM retained the ATM card because the machine was low on cash. The card that was retrieved by the Bank was identified by Ms. Baker as the card issued to Ragosta and was received in evidence.

The video tape revealed that on the evening in question, an individual approached the Bank's ATM terminal, left, returned and then left again. At trial, Ms. Baker positively identified Ragosta as the individual depicted on the video tape.

Ms. Baker also testified that when the ATM runs low on cash, it goes out of service and sends a message to the control center in Rutland, Vermont that a problem exists. A systems operator then contacts a member of that particular branch's personnel to investigate and fix the ATM. On the night in question, Ms. Baker was contacted and went to the ATM at the Marble Bank in Killington where she determined that the machine was very low on cash. She then directed the systems operator to turn the machine off for the night. At this point, the machine became inoperable. The video

tape verified that Ms. Baker was at the ATM that night. The video tape also revealed that between the time when Ragosta left the ATM and Ms. Baker approached the ATM, no one else engaged the ATM terminal.

A systems officer for Marble Bank testified at trial that, during the course of Ragosta's transactions, the Bank's ATM was off-line and was incapable of accessing customer information from the Marble Bank's main computer in Rutland. The ATM consequently could not automatically debit a customer's account and the Bank had no on-line control over the amount of money a person could withdraw at the machine.

A Vermont State Police Trooper testified that on December 22, 1989, he was called to the Bank to investigate the disappearance of approximately $9,000 from the Bank's ATM. After being told of the events of the previous evening at the ATM, the Trooper went to Ragosta's home where he was given *Miranda* warnings and consented to being questioned. The questioning led to a written statement by appellant, which was read to the jury. In the statement, Ragosta asserted that on the evening of December 21, 1989, he went to the ATM machine at the Marble Bank, placed his card in the machine and entered a request to withdraw $40 from his savings account. According to him, $80 came out of the machine. Ragosta stated that the machine then kept the card, and, after waiting for approximately twenty minutes for his card to be returned, he left the Bank without the card.

After the government rested, defense counsel moved for a judgment of acquittal.

The court denied the motion and then Ragosta rested. Thereafter, counsel again moved for a judgment of acquittal which also was denied. The court then charged the jury. After deliberating, the jury returned a verdict of guilty. There is no claim of error in the charge to the jury.

On June 5, 1991, Ragosta was sentenced to four months' imprisonment, three years' supervised release, and a $50 assessment was imposed. In addition, he was ordered to make restitution to the Marble Bank in the amount of $9,132.69. This appeal followed, and execution of the sentence was stayed pending appeal.

## DISCUSSION

The statute under which Ragosta was prosecuted, provides in its entirety:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344 (Supp. II 1990).

Although the indictment does not specify under which subsection of § 1344 Ragosta was charged, based on the language in the indictment and the jury instructions [1]—

---

1. In relevant part, the instructions provided:

A scheme or artifice is any plan or course of action for the accomplishment of an object. The phrase to defraud means to wrong one in his or her property rights by dishonest methods or schemes and usually signifies the deprivation of something of value by trick, deceit [sic], chicanery, or overreaching.

In this case the Government alleges that the Defendant's actions in obtaining money from the Marble Bank's automated teller machine satisfies the first element of knowingly executing and attempting to execute a scheme to defraud the Marble Bank. If you find that the Government has sustained its burden of proving that a scheme or artifice to defraud the

Marble Bank did exist, then you should consider the second element of the offense, namely whether the Defendant had the specific intent to defraud the Marble Bank when he used their automated teller machine on or about December 21st, 1989.

With respect to the second element, I instruct you that intent to defraud means wilful participation in the scheme with knowledge of its fraudulent nature and with the purpose that its illegal objectives be achieved. That is to say that the Defendant acted with the purpose either to disobey or disregard the law.
. . . .

With respect to the third and final element concerning whether the victim was a financial institution, the Government and the Defen-

both of which focus on "a scheme or artifice to defraud a financial institution"—we conclude that he was convicted of violating subsection (1) of § 1344. *See United States v. Medeles,* 916 F.2d 195, 197 (5th Cir.1990) (reaching similar conclusion with respect to subsection (2) of predecessor statute 18 U.S.C. § 1344(a)).

■ On appeal, Ragosta first argues that the government did not adduce sufficient evidence to prove beyond a reasonable doubt that he knowingly executed a scheme or artifice to defraud under § 1344(1) because the government failed to present evidence of a misrepresentation. He maintains that inherent in the phrase "scheme or artifice to defraud" is the requirement that there be proof of a misrepresentation of some kind.

■ As a general rule, the elements of common law fraud include, *inter alia,* a misrepresentation or a false pretense. *See, e.g., Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970–71 (2d Cir.1987). However, with respect to federal statutory bank fraud, because the two subsections of § 1344 are written in the disjunctive, courts have required proof of misrepresentation only when the defendant is charged with violating § 1344(2). *See United States v. Stone,* 954 F.2d 1187, 1189–90 (6th Cir. 1992); *United States v. Young,* 952 F.2d 1252, 1256 (10th Cir.1991); *United States v. Fontana,* 948 F.2d 796, 802 (1st Cir.1991) (Timbers, J., sitting by designation); *United States v. Celesia,* 945 F.2d 756, 758 (4th Cir.1991); *United States v. Schwartz,* 899 F.2d 243, 246 (3d Cir.) (dealing with predecessor statute § 1344(a)), *cert. denied,* —— U.S. ——, 111 S.Ct. 259, 112 L.Ed.2d 217 (1990); *see also Medeles,* 916 F.2d at 201 (court noted that it appeared that a conviction for a check kiting scheme could be sustained under predecessor statute § 1344(a)(1) even though no misrepresentation was made); *United States v. Bonallo,* 858 F.2d 1427, 1430–31 (9th Cir.1988) (indictment under predecessor statute § 1344(a) sufficiently set forth the elements of subsection (1) although it did not

allege false pretenses). We conclude that, contrary to appellant's contention, under the "'plain meaning' of the statute," § 1344(1) does not require proof of a misrepresentation. *See Schwartz,* 899 F.2d at 246 (interpreting predecessor statute § 1344(a)(1)).

■ Appellant next argues that, even if proof of a misrepresentation was unnecessary under § 1344(1), there was still insufficient evidence to support his conviction. He contends that because the "essence of fraud is deception," the government was required, yet failed, to prove that some conduct of his was calculated to, and did in fact, deceive a person of ordinary prudence and intelligence. We agree with appellant that under § 1344(1) the government was required to prove beyond a reasonable doubt that the "defendant engage[d] in or attempt[ed] to engage in a pattern or course of conduct designed to deceive a federally chartered or insured financial institution into releasing property, with the intent to victimize the institution by exposing it to actual or potential loss." *United States v. Stavroulakis,* 952 F.2d 686, 694 (2d Cir.) (discussing predecessor statute § 1344(a)(1)), *cert. denied,* —— U.S. ——, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992). We disagree, however, with appellant's contention that the government failed to present sufficient evidence as to his intent to defraud the Bank.

■ It is a fundamental general principle that appellants challenging the sufficiency of the evidence underlying a conviction bear a very heavy burden. *United States v. Zabare,* 871 F.2d 282, 286 (2d Cir.), *cert. denied,* 493 U.S. 856, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989). A conviction will be upheld if, "after viewing the evidence in the light most favorable to the prosecution," the reviewing court finds that *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

dant have agreed that the Marble Bank is a federally chartered and federally insured financial institution. Thus you may consider that the third element has been proved.

■ The jury's verdict must be sustained if it was supported by "substantial evidence." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). "The jury must have [had] a full opportunity to determine credibility, weigh the evidence, and draw justifiable inferences of fact, ... and all permissible inferences must be construed in favor of the government." *United States v. Martino*, 759 F.2d 998, 1002 (2d Cir.1985) (citation omitted). Further, the evidence need not eliminate every possible hypothesis of innocence. *See United States v. Soto*, 716 F.2d 989, 993 (2d Cir.1983). Moreover, a reviewing court must consider pieces of evidence not in isolation but in conjunction. *See United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). With these general principles in mind, we turn to the merits of appellant's second argument.

■ As the Third Circuit aptly observed: [t]he term 'scheme to defraud,' ... is not capable of precise definition. Fraud instead is measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community.

*United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir.1987) (dealing with predecessor statute § 1344(a)(1)); *cf.* W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 105, at 727 (5th ed. 1984) (describing the term "fraud" as "so vague that it requires definition in nearly every case").

In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court examined the term "to defraud" in the context of 18 U.S.C. § 1341, the mail fraud statute,[2] and stated that the term "commonly refer[s] 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signif[ies] the deprivation of something

of value by trick, deceit, chicane or over-reaching.' " *Id.* at 352, 358, 107 S.Ct. at 2877, 2880. Indeed, the trial court in the instant case used this language to define the term "to defraud" in its charge to the jury. Furthermore, we note that in *Hammerschmidt v. United States*, 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924), while examining the breadth of the predecessor to 18 U.S.C. § 371, the Supreme Court held that the term "conspire to defraud the [government]" meant *"primarily* to cheat the Government out of property or money." *Id.* at 185, 188, 44 S.Ct. at 511, 512 (emphasis added).

In *Schwartz*, the Third Circuit affirmed the defendant's bank fraud conviction for check kiting, concluding that his conduct violated subsection (1) of the predecessor statute § 1344(a). The court was apparently persuaded that, pursuant to the trial court's instructions, the jury must have found that the defendant knew that the checks he was depositing were worthless. Thus, there was no question that, when he engaged in the various withdrawals, he knew the money he was receiving was not his. *See Schwartz*, 899 F.2d at 247. The court stated that under these circumstances, "if [the defendant] did not depart from fundamental honesty, moral uprightness, fair play and candid dealings, then it is difficult to understand what conduct would constitute such a departure." *Id.*

Similarly, in *Celesia*, the Fourth Circuit upheld convictions under § 1344 for check kiting, rejecting the defendants' argument that they lacked the requisite fraudulent intent. 945 F.2d at 760. Noting that "[f]raudulent intent 'may be established by circumstantial evidence and by inferences deduced from facts and situations[,]' " *id.* at 759 (citation omitted), the court found that there was significant evidence to show that the appellants' conduct violated § 1344(1), because, like the defendant in *Schwartz*, these defendants were well

---

2. According to its legislative history, the bank fraud statute was modeled after the mail and wire fraud statutes. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 378 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3519. Therefore, precedents arising under those statutes can be helpful "to inform our interpretation of such amorphous phrases as 'scheme to defraud.' " *Stavroulakis*, 952 F.2d at 694.

aware that they had insufficient funds to cover the checks they had deposited. This, when coupled with the manner in which the defendants deposited the checks (in three locations at three different times in the same afternoon), was enough to negate their claimed lack of fraudulent intent. *Id.* at 760.

Ragosta argues on appeal that the only intent he possessed was an "intent to withdraw monies," and that during the events of the night in question he simply thought that he had "hit the lottery." It is apparent, however, that the jury chose to accept the government's position that Ragosta did possess the requisite intent to defraud. When viewed in the light most favorable to the government, the jury was free to find from the evidence that the Bank had a practice of granting customers whose accounts were in good standing the privilege of using an ATM card; also that Ragosta requested and received an ATM card after signing the Bank's required disclosure statement. The disclosure statement set forth certain restrictions that accompanied the privilege of using the card—including a provision that monies could only be withdrawn from the cardholder's checking or statement savings account, and, that, assuming the cardholder's account had sufficient funds, the cardholder could "withdraw up to $300.00 from ... Marble [Bank's ATM] terminals within each 24 hour period." By signing the disclosure statement, the jury could find that Ragosta understood and accepted such restrictions.

The government's evidence disclosed that, on the night in. question, Ragosta requested information regarding his account balance *before* he withdrew any money from the ATM. A jury reasonably could infer that the ATM informed him that he had a balance of $42.31 in his account; it also reasonably could infer that he had personal knowledge of his balance and certainly knew that he did not have $9,220 in his account. The jury could have found on both the direct and circumstantial evidence presented that the appellant, like the defendants in *Schwartz* and *Celesia*, was not only well aware of the amount of funds in his account, but also that he knew that under the Bank's disclosure statement he was entitled to no more than that amount. It is clear that the jury determined that Ragosta knowingly withdrew considerably more money than he knew to be available to him.

Because the ATM was off-line, it indiscriminantly complied with his thirty-four requests for funds[3] ranging from $80 to $300. Ragosta contends that this evidence merely proves that the Bank was consciously allowing an overdraft on his account. We reject this argument. We believe the jury reasonably could have inferred that, as an ATM cardholder, Ragosta had agreed to the restrictive conditions of card ownership and usage, and deliberately sought to cheat the Bank of funds to which he was not entitled. In short, the jury reasonably could have inferred that Ragosta saw an opportunity to deceive the Bank and concocted and executed a plan to withdraw as much money as he could. Clearly, the fact that his plan involved as many as thirty-six transactions is evidence from which the jury reasonably could infer that he knew that he had not simply "hit the lottery." His subsequent statement to the State Trooper that the ATM only dispensed $80 in response to his request for $40—obviously rejected by the jury as false—coupled with his agreement with the Bank regarding ATM card usage and the evidence revealed by the journal and the video tapes, provided abundant support for the jury's verdict.

There was ample evidence from which the jury reasonably could have inferred that Ragosta was intentionally cheating the Bank, *see Hammerschmidt*, 265 U.S. at 188, 44 S.Ct. at 512, of its property rights by dishonest methods or schemes, *see McNally*, 483 U.S. at 358, 107 S.Ct. at 2880, and that the jury could properly convict him under § 1344.

---

**3.** Although Ragosta engaged in thirty-six transactions, only thirty-four requests for funds were successful. The first was a balance inquiry and the thirty-sixth was not complied with by the machine because it had run low on cash.

CONCLUSION

The judgment is affirmed.