9 F.3d 1545
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Bernice Varendala PITTMAN, nee Bradley, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Eugene Franklin Morgan, Defendant-Appellant.
 Nos. 92-5692, 92-5797.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 11, 1993.
Decided: November 12, 1993.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Richmond.
 John F. McGarvey, Richmond, Virginia, for Appellant Morgan;Charles David Whaley, Morchower, Luxton & Whaley, Richmond, Virginia, for Appellant Pittman.
 David T. Maguire, Assistant United States Attorney, Richmond, Virginia, for Appellee.
 Kenneth E. Melson, United States Attorney, John G. Douglass, Assistant United States Attorney, Richmond, Virginia, for Appellee.
 E.D.Va.
 AFFIRMED.
 Before WIDENER and WILKINSON, Circuit Judges, and BRITT, United States District Judge for the Eastern District of North Carolina, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 Eugene Franklin Morgan and Bernice Varendala Pittman appeal their convictions in the United States District Court for the Eastern District of Virginia following a jury trial on a 36-count indictment charging them with various counts of wire fraud, mail fraud, bank fraud, money laundering, interstate transportation of money taken by fraud and conspiracy. The principal issue on appeal is the district court's denial of defendants' motion to suppress documents and derivative evidence obtained during a search of Morgan's motel room and effects. Defendants also make numerous sufficiency of the evidence challenges. Finding no error, we affirm.
 
 I. Factual Background
 
 2
 During a change of management at the Days Inn Chesterfield, Virginia (Days Inn), in early August 1990, it was discovered that Eugene Morgan was some $8,864 delinquent in his rental payments. While Morgan had made the first few payments during his 11-month stay at the motel, he failed to make most of the payments notwithstanding repeated requests for payment from management. In order to avoid eviction he had lied to the preceding motel manager about his intention and ability to pay. When demands for payment by the new manager failed, Days Inn decided to take legal action. On August 22, 1990, Brent Russell[1] signed a criminal complaint in support of an arrest warrant charging Morgan with attempting to defraud an innkeeper, VA. CODE ANN. § 18.2-188. On the morning of August 23, 1990, Russell and Lewis Labrue[2] accompanied the Chesterfield police to Morgan's motel room to assist in the execution of the arrest warrant and also to personally serve a notice of lien on Morgan for all of his property in Room 201.[3] Morgan was arrested and served with the innkeeper's lien. During the arrest they noticed that the motel room was filled with stacks of documents and a facsimile machine was set up in the room. Following Morgan's arrest and removal from the room, police officers re-entered the room pursuant to permission of the motel owner, Russell, and corporate counsel, Labrue, to view the various business documents and papers. These documents were subpoenaed from Days Inn a week later on August 31, 1990, and became the basis for an in-depth FBI investigation of Morgan and Mrs. Pittman.
 
 
 3
 The FBI investigation uncovered an elaborate fraud scheme spanning two years in which defendants defrauded numerous individual investors and small businesses.[4] Trial evidence established that Morgan and Mrs. Pittman falsely represented themselves as successful financial advisors and loan brokers with a long history of arranging investment and loan deals, when in actuality they used several variations of a loan or investment program to divert victims' money for their own. Among other fraudulent schemes, with Mrs. Pittman acting as the middle-man and Morgan as the money-man, they would: (1) falsely represent that if the victim would advance them a particular sum of money, they would use it to facilitate a large investment or loan-in return the victims were promised either double their money at the end of the investment or the closing of a large loan; (2) then obtain the victim's money and split it between themselves; and (3) when the victim asked for a refund, they made excuses for time delays, presented the victim with a bad check or simply ignored the requests. Of the 25 to 35 transactions Morgan and Pittman worked on together, a successful investment or loan was never arranged. Morgan and Mrs. Pittman rarely met their victims in person; hence there was abundant mail, facsimile, telephone, and wire correspondence.
 
 
 4
 On April 8, 1992, a federal grand jury indicted Morgan and Mrs. Pittman on charges of: conspiracy in violation of 18 U.S.C. § 371; 24 counts of wire fraud in violation of 18 U.S.C. § 1343; 2 counts of interstate transportation of money taken by fraud in violation of 18 U.S.C. § 2314; 1 count of mail fraud in violation of 18 U.S.C. § 1341; 1 count of bank fraud in violation of 18 U.S.C.s 1344; and 7 counts of money laundering in violation of 18 U.S.C. § 1956. Prior to his trial on these charges, Morgan moved to suppress the documents and derivative evidence as fruits of an illegal search. Following a suppression hearing on July 1, 1992, the district court denied the motion.[5] On July 15, 1992, a three-day jury trial began which resulted in Morgan's conviction on all counts and Mrs. Pittman's conviction on all counts except Count 10. This appeal follows.
 
 II. Consent Search of Motel Room
 
 5
 Morgan challenges the district court's denial of his motion to suppress evidence obtained when police searched his motel room and effects upon consent from the motel owner and corporate counsel. We review the district court's factual findings regarding suppression for clear error, and apply a de novo standard of review to the ultimate suppression decision. United States v. Rusher, 966 F.2d 868, 873 (4thCir.), cert. denied, 61 U.S.L.W. 3285 (U.S. 1992). The district court, relying on the Supreme Court's decision in Illinois v. Rodriguez, 497 U.S. 177 (1990), found that the police officers reasonably believed Russell and Labrue had authority to consent to the search of the motel room and Morgan's effects therein. The record supports that finding.
 
 
 6
 On the morning of August 23, 1990, Chesterfield police officers accompanied Russell and Labrue to Morgan's Days Inn motel room to execute an arrest warrant for defrauding an innkeeper and to serve him with an innkeeper's lien. Days Inn decided to take this legal action because Morgan was several thousand dollars behind in his rental payments and had failed to pay after receiving numerous informal requests and formal written demand for full payment by August 10, 1990. Following Morgan's service with the innkeeper's lien, arrest and removal from the motel room, the officers asked Russell and Labrue for permission to re-enter the motel room and look at items in plain view.[6] Russell, as the motel owner, and Labrue, as Days Inn corporate counsel, made direct assertions to the officers concerning the motel's legal right of entry to the room and right to possession and control of the room contents.[7] Nonetheless, Captain Burke thought the search questionable and asked the Assistant Commonwealth's Attorney to research Virginia law respecting innkeeper liens and rights in a guest's room and belongings. The Assistant Commonwealth's Attorney confirmed that they were on legal ground in conducting the search. Thereafter, the officers entered the room and looked at the documents in plain view for several minutes. Detective Joseph Franklin Lakato was called on-site and further viewing of the documents was conducted pursuant to the express consent of motel[8] personnel. Lakato returned the next day with Tom Bailey, an investigator from the State Corporation Commission, to view the documents pursuant, again, to express permission. Lakato and Thomas J. O'Donnell, an FBI investigator, also viewed the documents pursuant to yet another grant of permission a few days later. The motel room had been cleaned and Morgan's effects boxed and put into storage.
 
 
 7
 The standard for determining apparent authority to consent under Illinois v. Rodriguez is an objective inquiry asking "whether the facts available at the moment would warrant a person of reasonable caution in the belief that the consenting party had authority over the premises." Illinois, 497 U.S. at 177-78. We are of opinion that the facts available to the officers at the time of the search would warrant a person of reasonable caution in the belief that the hotel owner and corporate counsel had authority to consent to the search. Accordingly, there is no Fourth Amendment violation and the evidence was properly not suppressed.[9] See United States v. Kinney, 953 F.2d 866, 866-67 (4th Cir. 1992) (holding that evidence obtained by police acting under reasonable belief that defendant's girlfriend granted valid consent to search of locked closet in his apartment need not be suppressed); see also United States v. Tyler, 943 F.2d 420 (4th Cir. 1991) (entry by virtue of a civil claim and delivery judgment).
 
 III. Sufficiency of the Evidence
 
 8
 Defendants argue, jointly or severally, that the evidence presented at trial failed to support their convictions on various counts. The jury's verdict will be sustained if there is substantial evidence, taking the view most favorable to the government, to support it. Glasser v. United States, 315 U.S. 60, 80 (1942) (citations omitted).
 
 A. Money Laundering, Counts 30-36
 
 9
 Defendants argue that there was insufficient evidence to support their conviction on 7 counts of money laundering, 18 U.S.C. § 1956(a)(1)(B)(i), because there was no evidence that they did anything to conceal or disguise the source or nature of the proceeds of illegal activity or the identity of the parties in their Western Union transfers of the Bearden money. They argue that the money transfers were ordinary commercial transactions designed to conceal nothing.[10] We are of opinion that sufficient evidence of intent to conceal was put forth at trial to sustain Morgan and Mrs. Pittman's conviction on Counts 30-36.
 
 
 10
 In pertinent part, Section 1956(a)(1)(B)(i) reads,
 
 
 11
 knowing that the transaction is designed in whole or in part-(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;[11]
 
 
 12
 At trial it was established that on September 4, 1990, Leroy Mickey (on behalf of Price W. Bearden) wired $65,000 to Morgan's account to be held in escrow as a "refundable advance fee" in connection with a $5 million mortgage defendants were allegedly arranging for Bearden. However, the money was not kept in escrow or used to secure the loan, but rather was spent by defendants for personal use. The government presented evidence that between September 5 and October 12, 1990, a total of $25,850, representing Mrs. Pittman's portion of Bearden's $65,000 fraudulent "collateral," was transferred via Western Union by Morgan to Mrs. Pittman. There was evidence that until August 1990, defendants had split up their fraudulently obtained proceeds by inter-bank transfer of one lump sum. However, upon the FBI investigation, they employed new and more evasive strategies to transfer the fraudulent proceeds. Evidence established that Morgan converted Bearden's funds to cash (by writing checks or by split depositing checks) and then made seven small Western Union transfers over a period of two months to Mrs. Pittman's husband. FBI Agent O'Donnell testified that a financial investigator would not be able to easily trace this conversion and transfer of Bearden's money and that a Western Union transfer is an expensive means of money transfer. This is substantial evidence from which a jury could conclude that Morgan and Mrs. Pittman engaged in the Western Union transfers with the intent to conceal the nature, source, ownership or control of the $65,000 they had fraudulently obtained from Bearden.
 
 B. Substantive Fraud, Counts 2-29
 
 13
 Morgan claims that the government presented no direct evidence that he committed any of the alleged frauds, and thus, his convictions on Counts 2-29 must be overturned for failure to prove an essential element of every criminal case, identification. This argument is without merit. We find ample evidence in the record directly connecting Morgan to the frauds.[12] Morgan criticizes this evidence as being entirely circumstantial. We find the evidence to be both direct and circumstantial, and in any case, circumstantial evidence is treated no differently than direct evidence and may be sufficient to support a guilty verdict. See United States v. Jackson, 863 F.2d 1168, 1173 (4th Cir. 1989).
 
 C. Bank Fraud, Count 29
 
 14
 Mrs. Pittman argues that there was insufficient evidence of intent to defraud to sustain her conviction on one count of bank fraud, 18 U.S.C. § 1344, because there was no evidence establishing that she knew Morgan's $7,150 check, which she deposited, and immediately drew funds upon, from San Diego Trust and Savings Bank, was[13] worthless.
 
 
 15
 The government produced evidence that Morgan and Mrs. Pittman routinely wrote worthless checks and sham promissory notes to their victims in the double your money, advance fee, telephone and lodging frauds.[14] Evidence was also presented that Morgan and Mrs. Pittman engaged in a small trial run of their bank fraud by submitting a worthless check for $675 to the bank in October 1989, two months before the major bank fraud on December 27, 1989. On December 27, 1989, Mrs. Pittman deposited Morgan's worthless $7,150 check. Mrs. Pittman withdrew substantially all that sum within the next seven days, wiring Morgan $2,150 on the same day, and when the check was returned unpaid, the bank lost substantially all of the $7,150. The record also shows that during a phone conversation with a bank official attempting to follow-up the bad check, Mrs. Pittman refused to provide her new address or telephone number. We are of opinion that this was sufficient evidence from which the jury could infer that Mrs. Pittman knew Morgan's check was worthless, that the immediate withdrawals were a part of a plan, and that she intentionally participated in a scheme to defraud a financial institution by the deposit and withdrawals. There is no significant difference between this case and Celesia, supra, n. 14.
 
 
 16
 D. Wire Fraud, Mail Fraud, Interstate Transportation of Money Taken by Fraud, Counts 2-9, 11-28
 
 
 17
 Mrs. Pittman also argues that there was insufficient evidence of criminal intent to support her convictions on 24 counts of wire fraud, 18 U.S.C. § 1343, 1 count of mail fraud, 18 U.S.C. § 1341, and 1 count of interstate transportation of money taken by fraud, 18 U.S.C. § 2314. She argues that the evidence at trial proved only guilt by association, and that while her association with Morgan was unfortunate, it was not criminal. To convict a defendant on charges of mail fraud, wire fraud and interstate transportation of money taken by fraud, the government must prove fraudulent intent. 18 U.S.C.ss 1341, 1343, 2314. Fraudulent intent can be established by circumstantial evidence and by inferences deduced from facts. United States v. Ham, 998 F.2d 1247, 1254 (4th Cir. 1993). We find that there was evidence from which a jury could conclude that Mrs. Pittman was an active, knowing and intentional participant in the scheme to defraud these individuals.
 
 
 18
 Mrs. Pittman first contends that the evidence was insufficient to prove that she knew the money she caused to be transported interstate, see 18 U.S.C. § 2314, was taken by fraud and therefore her conviction on Count 8 should not stand. Mrs. Pittman was convicted under Count 8 of violation of 18 U.S.C. § 2314 for knowingly and willfully causing money taken by fraud to be transported in interstate commerce in connection with a $15,000 check Janie Odom mailed by Federal Express from Texas to Morgan in Virginia. At trial, there was evidence that: (1) between May and October, 1989, Mrs. Pittman convinced her friend Odom to join an "investment deal" by sending a "refundable" check for $15,000; (2) that she induced Odom on November 1, 1989, to mail from Dallas, Texas, by Federal Express, a $15,000 cashier's check to Morgan in Richmond, Virginia to be held in escrow; and thereafter (3) that Mrs. Pittman collected $7,000 thereof by wire transfer Morgan made out of the escrow account the very next day, which she immediately withdrew in fifteen small transactions. We find that the jury had substantial evidence from which it could infer that Mrs. Pittman not only knew Odom's $15,000 had been taken by fraud, but intentionally joined in the common plan to defraud her as charged in count 8.
 
 
 19
 We are also of opinion that there is substantial evidence, viewed in the light most favorable to the government, to sustain Mrs. Pittman's conviction on Count 6 of mail fraud, 18 U.S.C.s 1341. For conviction under the federal mail fraud statute specific intent to defraud must be proven. Ham, 998 F.2d at 1254. The government presented substantial evidence that Mrs. Pittman was involved with Morgan in a general scheme to defraud small businesses and individual investors, and specifically, that in April 1989 Mrs. Pittman convinced Julia Murray, agent for William and Jeanne Hollingsworth, to join in on a fraudulent double your money loan program by sending Murray an $8,000 promissory note in the U.S. mails, thereby inducing Murray to invest $4,000. Mrs. Pittman immediately wired half of Murray's $4,000 to Morgan. Neither defendant used the money to close loans and the money was not refunded upon non-closure as promised. We are of opinion that substantial evidence was presented from which a jury could infer that Mrs. Pittman acted with specific intent to defraud Murray and caused the U.S. mails to be used in furtherance of this scheme to defraud as charged in count 6.
 
 
 20
 Mrs. Pittman also argues that there was insufficient evidence to sustain her conviction on 24 counts of wire fraud, 28 U.S.C. § 1343. Counts 2-5, 7, 9, and 11-28 describe in detail the numerous loan or investment scams in which Morgan and Mrs. Pittman used interbank money wires; wire facsimiles of promissory notes, letters, or documents; or telephone calls to lure the victims into the fraudulent transaction, to obtain their up-front "advance fees" or "collateral guarantees," and to avoid refunding the victims' money. At trial, the government put on witnesses testifying to these transactions and introducing into evidence copies or originals of the wire facsimiles of promissory notes, documents, and records of the interbank money wires and telephone calls. While Mrs. Pittman admits she was an active participant in these transactions, she denies any knowledge of their fraudulent nature and claims to be yet another victim of Morgan's deceit. Mrs. Pittman claims that any money she received over the two-year period, which was actually victims' money, was compensation for services rendered to Morgan and that her name was forged on the documents.
 
 
 21
 Testimony at trial established that Mrs. Pittman had experience in packaging loan deals. She had previously worked for IMPACT, a federally funded agency, as a financial analyst packaging loans for minority businesses. During her year and a half with IMPACT, Mrs. Pittman successfully packaged loans for amounts between $50,000 and $700,000. Almost all of the alleged transactions with the Hollingsworths, Janie Odom, Clarence Frater, James Frieson, and Price Bearden directly involved Mrs. Pittman and her name was on many of the documents. There was evidence that Mrs. Pittman lied to victims on numerous occasions, knowingly wrote bad checks and fraudulent promissory notes, misappropriated the allegedly refundable advance fees for her own use and not once closed a loan package or investment deal. The jury could easily infer from Mrs. Pittman's experience and the other evidence in the record that she was not innocently blind to Morgan's deceit during her two-year participation in the scheme in which not even a single loan or investment came to fruition. We are of opinion that there was substantial evidence from which the jury could conclude that Mrs. Pittman knew, and in fact intended, that the loans she packaged in concert with Morgan were a scheme to defraud individuals out of their money, and that she transmitted or caused to be transmitted by wire, facsimile or telephone communications in furtherance of this scheme. There is sufficient evidence of fraud to sustain convictions on Counts 2-5, 7, 9, and 11-28.
 
 IV. Conclusion
 
 22
 We are of opinion that the search of Morgan's motel room and effects did not violate the Fourth Amendment's prohibition against unreasonable search and seizures, thus the district court properly denied the motion to suppress. We are also of opinion that the government presented sufficient evidence against Morgan and Mrs. Pittman to sustain their convictions on all counts.
 
 
 23
 Accordingly, the judgment of the district court is
 
 
 24
 AFFIRMED.
 
 
 
 [1]
 Brent Russell is the assistant vice-president of operations for Southeastern Associates, the operator of Days Inn Chesterfield. Russell was the corporate representative supervising the problem Days Inn was having with two delinquent customers, one of which was Eugene Morgan
 
 
 [2]
 Lewis A. Labrue, of the firm of Clement & Wheatley, is corporate counsel for Southeastern Associates (Days Inn). Labrue advised Southeastern Associates it could take legal action against Morgan
 
 
 [3]
 An innkeeper has a lien upon and right of possession in the property of his guest for all proper charges due. VA. CODE ANN. § 43-31. He may also sell such property if the debt is not paid within ten days. VA. CODE ANN. § 43-34
 
 
 [4]
 A detailed discussion of the facts involved in the separate counts is reserved for section III, infra, where we discuss defendants' sufficiency of the evidence challenges
 
 
 [5]
 Findings of fact and conclusions of law were stated from the bench
 
 
 [6]
 Labrue, Russell and the arresting officers had become suspicious, considering Morgan's arrest for inability to make payments, after seeing the stacks of paper in the motel room and noticing the enormous amounts of money recorded on documents lying open on the bed
 
 
 [7]
 Officers present that day testified that Russell and Labrue told them that under Virginia lien law the hotel now had control and possession of the room and of Morgan's effects contained therein as security for his overdue payments. They then gave the officers express permission to look at the room and anything in open view
 
 
 [8]
 Once Detective Lakato was called onto the scene, he and Captain Burke again consulted the Virginia Code to assure that Russell and Labrue's representations as to their authority to consent to the search and seizure of Morgan's effects were accurate
 
 
 [9]
 Because we find that the officers reasonably believed Russell and Labrue had authority to consent to the search, we need not address the argument that the motel did not have actual authority under Virginia innkeeper's lien law. See Kinney, 953 F.2d at 866-67 (holding that no Fourth Amendment violation exists where consenting party had apparent authority, but not actual authority, to consent to the search)
 
 
 [10]
 At oral argument while defendants admitted, as they must have, that the money sent by Western Union was obtained by fraud, and thus was the proceeds from unlawful activity, they argued that they did nothing to conceal its nature and thus could not be convicted under § 1956(a)(1)(B)(i)
 
 
 [11]
 More fully, the money laundering statute provides that:
 (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity-
 ...
 (B) knowing that the transaction is designed in whole or in part-
 (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;....
 18 U.S.C. § 1956(a)(1)(B)(i).
 
 
 [12]
 Brent Russell and Patricia Simmon, employees of the Days Inn, identified Morgan as the one who defrauded them regarding lodging fees and invalid checks. Agent Thomas J. O'Donnell, who had also personally met Morgan, identified his voice on the incriminating Bearden tape (Bearden taped a telephone conversation he had with Morgan regarding the loan and $65,000 refundable advance). Wade and Mickey, two victims of the loan fraud, identified Morgan in person. Documents found in Morgan's Days Inn motel room matched victims' copies all over the country
 
 
 [13]
 The bank fraud statute, 18 U.S.C. § 1344, states:
 Whoever knowingly executes, or attempts to execute, a scheme or artifice-
 (1) to defraud a financial institution; or
 (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
 shall be....
 
 
 [14]
 This Circuit has held that the mere writing of checks not backed by sufficient funds is not defrauding a bank as defined by 18 U.S.C. § 1344(1) or (2), absent a showing that the bank suffered a loss. United States v. Orr, 932 F.2d 330 (4th Cir. 1991). We have, however, held that by intentionally depositing worthless checks and withdrawing funds thereon, a defendant knowingly executed a scheme to defraud a financial institution under 18 U.S.C. § 1344(1). United States v. Celesia, 945 F.2d 756 (4th Cir. 1991)