66 F.3d 317
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Julien K. DILKS, Defendant-Appellant.
 No. 94-5821.
 United States Court of Appeals, Fourth Circuit.
 Submitted Aug. 8, 1995.
Decided Sept. 14, 1995.
 
 John P. Fishwick, Jr., David A. Clark, Fishwick, Jones & Glenn, Roanoke, VA, for appellant.
 Robert P. Crouch, Jr., U.S. Atty., Thomas L. Eckert, Asst. U.S. Atty., Roanoke, VA, for appellee.
 Before HALL, WILKINS and MOTZ, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Julien K. Dilks appeals his conviction for bank fraud under 18 U.S.C.A. Sec. 1344 (West Supp.1995). He contends that insufficient evidence existed to convict him and that he should not have been prosecuted under the bank fraud statute. Finding no error, we affirm.
 
 I.
 
 2
 Testimony disclosed that Dilks and Marco Montemezzi, Dilks' longtime friend and mentor, founded the JMA Foundation ("JMA") and National Brain Injury Research Group ("NBIRG") in Washington, D.C., to provide information and support to patients recovering from brain injuries. Dilks acted as president of JMA and NBIRG, and Montemezzi was JMA's primary contributor and usually assisted JMA with any financial difficulties. Although Montemezzi eventually declared bankruptcy, he had provided in his will for JMA to receive money to clear its debts and had begun to make arrangements to sell his home to benefit JMA.
 
 
 3
 In addition to acting as JMA and NBIRG's president, Dilks handled the finances for both organizations. JMA experienced some difficulty in raising funds and meeting the payroll for its small number of employees. Despite JMA's financial problems, Dilks opened checking accounts at Franklin National Bank ("FNB") in Washington, D.C., First Virginia Bank ("FVB") in Charlottesville, Virginia, and First American Bank ("FAB"), in Washington, D.C. Dilks also opened an investment account at Merrill Lynch, which never held securities.
 
 
 4
 Dilks made many large transactions between the JMA accounts. On August 17, 1992, Dilks deposited into JMA's FAB account a check drawn on FVB in the amount of $35,000. Two days later, Dilks deposited another $35,000 check drawn on FVB into JMA's FAB account. On the next day, August 20, Dilks conducted three transactions. First, he deposited a $47,000 check from Montemezzi into JMA's FNB account. Montemezzi had asked Dilks to hold the check until he transferred sufficient funds to cover it. Second, from the inflated FNB account, Dilks withdrew $45,000 and deposited a check for that amount into the FVB account. Finally, he wrote a $9500 check drawn on JMA's FVB account and deposited it back into the FNB account. The checks drawn on FVB were returned for insufficient funds: On August 20, FAB returned the August 17 $35,000 check; on August 24, FNB returned the $9500 check; and between August 25 and August 28, FAB returned the August 19 $35,000 check. Also between August 25, and August 28, FNB returned Montemezzi's $47,000 check and FVB returned the $45,000 check.
 
 
 5
 In order to expand JMA's reach, Dilks established a satellite office in Charlottesville, Virginia. In addition to checking accounts already established, Dilks opened a checking account in Charlottesville at Jefferson National Bank ("JNB"), a bank insured by the Federal Deposit Insurance Corporation. He opened this account on August 24, the day on which Montemezzi committed suicide. Dilks also conducted several transactions through JMA's JNB account. On September 1, 1992, Dilks deposited a $35,000 check drawn on JMA's JNB account into the Merrill Lynch account, which was returned for insufficient funds. The next day, Dilks deposited a $35,000 check drawn on FNB into the JNB account. FNB returned the check for insufficient funds on September 8, which created a small overdraft in the JNB account.
 
 
 6
 On September 24, 1992, Dilks deposited a $10,000 check from JMA's Merrill Lynch account to the JNB account. One day later, Dilks wrote a $10,000 check drawn on the JNB account to Nathan Zasler, and he withdrew $6000 in cash. JNB allowed the $6000 cash withdrawal based on the September 24 $10,000 deposit, which Merrill Lynch returned for insufficient funds on September 29.
 
 
 7
 Dilks wrote another check drawn on the Merrill Lynch account for $29,000 and deposited it into the JNB account on September 28. JNB did not place a hold on the check because the teller accepting the deposit felt that Dilks was an established customer. On September 29, Merrill Lynch notified Dilks that it had closed JMA's account. Also on September 29, Dilks withdrew $20,000 from the JNB account using a counter withdrawal ticket, he purchased a cashier's check payable to FAB, and he withdrew another $2000 in cash. JNB released these funds based on the $29,000 Merrill Lynch deposit. Finally, on October 6, 1992, Merrill Lynch returned the $29,000 check unpaid because the account had been closed, creating a $12,104.37 overdraft in the JNB account. JNB notified the Federal Bureau of Investigation ("FBI") that it suspected an intent to defraud.
 
 
 8
 An FBI agent testified that during his interview with Dilks, Dilks "wasn't very straightforward[,] and it was kind of difficult getting questions answered." The agent explained the concept of check kiting to Dilks as "deposit[ing] checks into a checking account knowing that there's no funds for that check and then drawing off of that checking account funds to pay for other expenses." Dilks agreed that he operated a check kiting scheme and stated that he expected to receive money from Montemezzi's estate to pay JMA's debts and cover the $35,000 check drawn on FNB and the $10,000 and $29,000 checks drawn on Merrill Lynch, all of which were deposited into the JNB account. The agent also testified that Montemezzi asked Dilks to hold the $29,000 check because he was not sure if there were sufficient funds to cover the check, and that Dilks thought the $35,000 and $10,000 checks probably would bounce too.
 
 
 9
 At the close of the bench trial, the district court concluded that Dilks attempted to obtain money to which he was not entitled and that he intended to defraud JNB. The court found it significant that Dilks opened accounts at five different institutions to operate a small organization. The court sentenced Dilks to ten days imprisonment, ordered four years of supervised release, ordered restitution, and imposed a fine and a special assessment. This appeal followed.
 
 II.
 
 10
 Dilks claims that there was insufficient evidence to find that he intended to defraud JNB. He contends that he acted "from the combined weight of his personal circumstances and the precarious financial position of JMA." Dilks also asserts that there was insufficient evidence of intent because he did not benefit personally from his actions, he was not required personally to cure JMA's debts, and he believed that the Montemezzi checks ultimately would be honored.
 
 
 11
 "To sustain a conviction the evidence, when viewed in the light most favorable to the government, must be sufficient for a rational trier of fact to have found the essential elements of the crime beyond a reasonable doubt." United States v. Brewer, 1 F.3d 1430, 1437 (4th Cir.1993); see Glasser v. United States, 315 U.S. 60, 80 (1942). We consider circumstantial and direct evidence and allow the government the benefit of all reasonable inferences from the facts proved to facts sought to be established. United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982). If substantial evidence exists to support a verdict, the verdict must be sustained. Glasser, 315 U.S. at 80. Further, even if some facts support a contrary conclusion, we do not weigh the evidence or judge the credibility of witnesses. United States v. Reavis, 48 F.3d 763, 771 (4th Cir.) (citing United States v. Saunders, 886 F.2d 56, 60 (4th Cir.1989)), cert. denied, 63 U.S.L.W. 3890 (U.S.1995).
 
 
 12
 To support a bank fraud conviction under Sec. 1344 "based on a check kiting scheme, the government is required to prove beyond a reasonable doubt that the defendant engaged in or attempted to engage in a pattern or course of conduct designed to deceive a financial institution with intent to cause actual or potential loss." United States v. LeDonne, 21 F.3d 1418, 1427-28 (7th Cir.) (citing United States v. Ragosta, 970 F.2d 1085, 1089 (2d Cir.), cert. denied, 61 U.S.L.W. 3400 (U.S.1992)), cert. denied, 63 U.S.L.W. 3420 (U.S.1994). Further, "[f]raudulent intent 'may be established by circumstantial evidence and by inferences deduced from facts and situations.' " United States v. Celesia, 945 F.2d 756, 759-60 (4th Cir.1991) (quoting United States v. Bales, 813 F.2d 1289, 1294 (4th Cir.1987)).
 
 
 13
 Because we do not review the factfinder's credibility determinations, see Reavis, 48 F.3d at 771, and because we take the evidence in the light most favorable to the Government, see Brewer, 1 F.3d at 1437, we find that sufficient evidence existed for a rational factfinder to conclude Dilks intended to defraud JNB. Although Dilks contends that he did not intend to defraud JNB because he did not benefit personally, it is not necessary for a defendant to receive a personal benefit to support a bank fraud conviction. United States v. Moede, 48 F.3d 238, 242 (7th Cir.1995) (citing United States v. Knipp, 963 F.2d 839, 846 (6th Cir.1992)). Further, circumstantial evidence need not exclude every reasonable hypothesis of innocence. See United States v. Jackson, 863 F.2d 1168, 1173 (4th Cir.1989). Therefore, we find that sufficient evidence existed to convict Dilks of bank fraud. See Glasser, 315 U.S. at 80; LeDonne, 21 F.3d at 1427-28.
 
 III.
 
 14
 Dilks also claims that the Government's prosecution of him "constituted an unauthorized use of the federal bank fraud statute in a bad check case and as a collections device." He also contends that his failure to cure JMA's shortfall in the JNB account was the determining factor in the Government's decision to prosecute, thereby making his prosecution "nothing more than a federal criminal version of a civil collections suit."
 
 
 15
 We have held that the mere writing of checks not backed by sufficient funds is not defrauding a bank as defined by Sec. 1344, absent a showing that the bank suffered a loss. United States v. Orr, 932 F.2d 330 (4th Cir.1991). Here, JNB suffered a loss of over $12,000. Moreover, we have also held that check kiting can constitute a scheme to defraud and that by intentionally depositing worthless checks and withdrawing funds thereon, a defendant knowingly executed a scheme to defraud a financial institution under Sec. 1344. See Celesia, 945 F.2d at 759-60. As discussed above, there was sufficient evidence to convict Dilks of bank fraud. Therefore, the Government properly prosecuted Dilks under the bank fraud statute.
 
 IV.
 
 16
 Accordingly, we affirm Dilks' bank fraud conviction. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.
 
 
 17
 AFFIRMED.