**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOHNNY WILLIAM CABE, a/k/a Bill Cabe,

*Defendant-Appellant.*

No. 01-4811

Appeal from the United States District Court
for the District of South Carolina, at Rock Hill.
Joseph F. Anderson, Jr., Chief District Judge.
(CR-00-301)

Argued: December 6, 2002

Decided: January 23, 2003

Before WILKINSON, Chief Judge, MOTZ, Circuit Judge, and
James P. JONES, United States District Judge for the
Western District of Virginia, sitting by designation.

---

Affirmed by unpublished opinion. Judge Jones wrote the opinion, in
which Chief Judge Wilkinson and Judge Motz joined.

---

### COUNSEL

**ARGUED:** Richard Dwight Biggs, LAW OFFICE OF MARCIA G.
SHEIN, P.C., Decatur, Georgia, for Appellant. Dean Arthur Eichel-
berger, Assistant United States Attorney, Columbia, South Carolina,
for Appellee. **ON BRIEF:** Marcia G. Shein, LAW OFFICE OF

MARCIA G. SHEIN, P.C., Decatur, Georgia, for Appellant. J. Strom Thurmond, Jr., United States Attorney, Columbia, South Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

JONES, District Judge:

Johnny William Cabe appeals from his conviction and sentence for wire fraud and money laundering. Cabe argues that the government failed to prove the elements of the charges. In addition, he claims that the district court erred in sentencing him by using relevant conduct to find a loss amount in excess of five million dollars. Finding sufficient evidence and no reversible error, we affirm.

I.

Cabe was pastor of a small independent Baptist church in Rock Hill, South Carolina. Beginning in January 1998 and continuing through October 1998, Cabe and another minister, Shelton Joel Shirley, solicited individuals to invest money in an investment scheme called "high yield trading programs." They promoted the scheme as a charitable venture affiliated with a religious organization, Hisway International Ministries of London, England.[1] Cabe and Shirley told potential investors that they had contacts with "traders" who would invest their money in European bank debentures. Some solicitations described the investments as charitable "gifts" and the return of investments as "re-gifts" and suggested that because of their charitable nature, there would be no tax consequences.

---

[1] The investment scheme was offered under various names, including Gideons Christian Family Wellness Center and Hisway Financial Associates.

Cabe portrayed the investment programs as profitable and without risk and claimed that investors typically would double their money within thirty to ninety days of investment. Cabe told potential investors that he had been receiving large profits from his personal investments in the programs and that "through years of research and three years of participation" in the program he had been able to secure the necessary contacts in order to invest in the programs.

Potential investors were given documents describing the lucrative nature of the scheme and prohibiting them from revealing any information relating to it. The documents instructed that if any such disclosure occurred, the investor would forfeit the investment. Investors were also required to pay a three percent "administration gift" fee to Cabe on every transaction.

On January 9, 1998, Cabe began establishing bank accounts in order to aggregate and aid in the transfer of investors' funds. Upon receiving contributions from investors, Cabe wired the funds to various organizations and individuals for alleged investment. The evidence at trial showed that these investments were in fact fictitious and that the money was stolen by the traders. Moreover, the evidence established that $679,317 of investors' contributions were diverted to Cabe, Shirley, and their families.

In the course of their dealings with investors, Cabe and Shirley recruited "stewards" for the scheme. After making a contribution to Cabe's ministry, the stewards were tasked with recruiting other investors for the programs. In order to recruit stewards, some of whom were already investors, Cabe provided them with literature detailing the success of the programs. In return for recruiting new investors, these stewards expected to receive a portion of the profits from maturing investments.

In meetings with investors, Cabe categorically stated that none of his prior investments had faced any problems. However, beginning in April 1998, Cabe complained to the "traders" that he had not received any return on the investments and was unable to pay any of his contributors. He expressed concern that he would not only lose future potential investors, but that he also might be "sued for fraud." Even with this knowledge, however, Cabe continued to solicit investors

with representations that the programs were highly profitable and risk-free.

In July 1998, after certain of the investors demanded payment of the promised return on their investments, Cabe transferred money to some of them. Cabe represented that these payments were profits from their investments in the trading programs. However, these funds were in reality from the aggregated funds of new investors. The evidence presented at trial showed that these payments to investors were made to prove the programs profitable and to encourage further investments.

In February 1999, following inquiries by federal law enforcement officers, Cabe and Shirley directed investors to call an international telephone number in order to obtain information relating to the programs. At this number, an associate of Cabe had placed a warning message that investors were not to discuss or disclose any details about the scheme to government officials.

Eventually Cabe and Shirley were indicted in the court below. Shirley pleaded guilty and testified for the government at trial. One of the alleged traders, Terence Wingrove, an English art dealer, also testified for the government pursuant to a plea agreement. He admitted that he had received several million dollars in investment money from Cabe, which he had stolen.

Cabe testified on his own behalf at trial and defended his actions by claiming that he had been merely a victim in the investment scheme. He contended that he had acted in good faith and had been an innocent pawn of the traders. He denied lying or misrepresenting the program to the investors and testified that he only relayed information from the traders to the investors.

The jury convicted Cabe of all twenty-six felony counts relating to the fraudulent investment scheme. The convictions included nine counts of wire fraud in violation of 18 U.S.C.A. § 1343 (West 2000) (counts one through nine); two counts of money laundering in violation of 18 U.S.C.A. § 1956(a)(1)(A)(i) (West 2000 & Supp. 2002) (counts ten and eleven); thirteen counts of money laundering in violation of 18 U.S.C.A. § 1957 (West 2000) (counts twelve through

twenty-five); and one count of conspiracy to obstruct justice in violation of 18 U.S.C.A. §371 (West 2000) (count twenty-six).

II.

A.

Cabe first argues that there was insufficient evidence to find him guilty of the wire fraud charges.

In evaluating the sufficiency of the evidence, we consider whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Lomax,* 293 F.3d 701, 705 (4th Cir. 2002) (quoting *United States v. Myers*, 280 F.3d 407, 415 (4th Cir. 2002)). Secondly, "[w]e review the sufficiency of the evidence by determining whether 'there is substantial evidence, taking the view most favorable to the Government, to support' the verdict." *United States v. Edwards*, 188 F.3d 230, 234 (4th Cir. 1999) (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)).

In order for a defendant to be found guilty of wire fraud, the government must prove: (1) the existence of a scheme to defraud that involved a material falsehood, and (2) the use of interstate wire communications to facilitate the scheme. *See* 18 U.S.C.A. § 1343. In addition, the government must also prove the defendant acted with fraudulent intent in committing these acts. *See United States v. Ham*, 998 F.2d 1247, 1254 (4th Cir. 1993).

This court has held that "fraudulent intent 'may be established by circumstantial evidence and by inferences deduced from facts and situations.'" *United States v. Celesia*, 945 F.2d 756, 759 (4th Cir. 1991) (quoting *United States v. Bales*, 813 F.2d 1289, 1294 (4th Cir. 1987)). Similarly, "fraudulent intent may be inferred from the totality of the circumstances and need not be proven by direct evidence." *United States v. Ham*, 998 F.2d at 1254.

Cabe relies on *United States v. Brown*, 79 F.3d 1550, 1557 (11th Cir. 1996), in which the court held that the government did not show that the defendant acted with fraudulent intent because he had not cre-

ated a scheme "reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* Cabe contends that a person of ordinary prudence and comprehension would not have relied on his representations or those of his accomplices. He asserts that because the victims did not investigate the validity of the investment program, consult financial professionals, or make any attempts to substantiate the claims regarding the success of the program, their actions were not those of a person of ordinary prudence.

We have previously held that criminal fraud does not take into account the victims' lack of prudence:

> The susceptibility of the victim of the fraud . . . is irrelevant to the analysis. "If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts."

*United States v. Colton*, 231 F.3d 890, 903 (4th Cir. 2000) (quoting *United States v. Brien*, 617 F.2d 299, 311 (1st Cir. 1980)). However, even if we were to accept Cabe's argument that in order to prove fraudulent intent the government must show that the scheme was "reasonably calculated to deceive persons of ordinary prudence and comprehension," the evidence here was sufficient. First, the victims' failure to conduct investigations of Cabe's scheme is explained by the fact that there was no readily available external source for the investors to obtain further information. As Cabe stressed in his solicitations to investors, these were supposed secret investment opportunities known only to a small number of wealthy persons. Additionally, because of the non-disclosure requirements, investors were dissuaded from conducting any outside research. Finally, Cabe's position as a religious leader and his alleged charitable motivation led victims to believe that his representations were truthful.

Furthermore, as demonstrated by the evidence at trial, one victim's research attempts proved that an investigation of the scheme did not discourage even a relatively savvy investor from relying on Cabe's representations. Before investing, Ralph Nurnberger, a Capitol Hill lobbyist and adjunct professor at Georgetown University, discussed

his proposed investment with friends, including a financial planner, a former Wall Street broker, and an international developer. None of these individuals had any information that caused him to doubt Cabe's representations.

For these reasons, the appellant's contention that the evidence was insufficient to prove the charges of wire fraud is without merit.[2]

B.

The next argument presented by Cabe is that he may not be convicted of money laundering as charged in counts twelve and thirteen because the money laundering occurred before any of the wire fraud charged in the indictment. The monetary transactions charged in these counts occurred on July 2, 1998, eleven days before the first alleged wire fraud. Cabe asserts that because this money laundering predated any of the other criminal activity charged in the indictment, the funds were not "criminally derived" and therefore fail to satisfy a required element of the offense.

In order to sustain a conviction under these counts, the government must prove that (1) the defendant knowingly engaged (2) in a monetary transaction (3) in criminally derived property (4) of a value greater than $10,000 (5) derived from specified unlawful activity. *See* 18 U.S.C.A. § 1957(a). Criminally derived property is "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C.A. § 1957(f)(2).

---

[2]Cabe additionally argues that because there was insufficient evidence presented to convict him of the wire fraud counts, the convictions for the money laundering counts must be reversed because there was no predicate illegal conduct. Because we have concluded that sufficient evidence existed, this claim is without merit.

Cabe also separately challenges his conviction under Count Two of the indictment, claiming that no evidence was presented that the victim, Eddie Howard, transferred any money. This contention was not raised below and thus is subject to a plain error analysis. *See* Fed. R. Crim. P. 52(b). The evidence at trial was clear that although Eddie Howard did not personally make a wire transfer, one was made from his account to Cabe following a face-to-face solicitation by Cabe. The jury could therefore properly infer that the defendant's conduct caused the wire transfer.

While not previously addressed by this court, other circuits have made it clear that there is no requirement that a defendant be convicted of any specific unlawful activity for a money laundering conviction to be sustained. A conviction for money laundering under 18 U.S.C.A. § 1957 "does not require proof that the defendant committed the specified predicate offense; it merely requires proof that the monetary transaction constituted the proceeds of a predicate offense." *United States v. Richard*, 234 F.3d 763, 768 (1st Cir. 2000) (citations omitted); *see also United States v. De La Mata*, 266 F.3d 1275, 1292 (11th Cir. 2001); *United States v. Mankarious*, 151 F.3d 694, 703 (7th Cir. 1998); *United States v. Whatley*, 133 F.3d 601, 605-06 (8th Cir. 1998); *United States v. Tencer*, 107 F.3d 1120, 1130 (5th Cir. 1997); *United States v. Kennedy*, 64 F.3d 1465, 1480 (10th Cir. 1995).

In *United States v. Smith*, 44 F.3d 1259, 1265 (4th Cir. 1995), we held that it is not necessary for an indictment to allege any specific illegal activity from which criminally derived funds were acquired. We noted that

> [t]he core of money laundering, which distinguishes one such offense from another, is the laundering transaction itself. Because the requirement that the funds be illegally derived is not the distinguishing aspect and therefore does not lie at the core of the offense, details about the nature of the unlawful activity underlying the character of the proceeds need not be alleged.

*Id.* There is thus no requirement that there must be a conviction for an underlying predicate offense. As the case law demonstrates, it is only necessary that the government provide sufficient evidence from which the jury can determine that the monies involved were criminally derived.

In this case, the specified criminal activity was alleged in the indictment and presented to the jury. Paragraph thirteen of count one of the superseding indictment, which was re-alleged in counts twelve and thirteen, charges that

> [b]eginning on or about a date unknown to the grand jury but at some time between January and July 1998 . . . Johnny

William Cabe and Shelton Joel Shirley knowingly and willfully did devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses.

J.A. at 24. The government presented evidence that Cabe knew at least by April 1998 that the investment program he was running was not as purported and yet he continued to solicit investors and acquire funds through misrepresentation and deceit. This evidence was sufficient to show that there was unlawful activity occurring before July 2, 1998, and that the money transfers alleged in counts twelve and thirteen consisted of monies that were criminally derived.

Cabe makes a similar argument as to the money laundering offenses charged in counts twenty through twenty-three and count twenty-five. He asserts that the criminally derived funds from the wire fraud counts were exhausted by money laundering counts ten through nineteen and count twenty-five. Cabe was charged in counts ten through twenty-five of laundering $1,068,409. However, he argues that because the amount charged in the wire fraud counts total only $601,305, the criminally derived funds were exhausted by less than all of the money laundering counts.

This argument is also erroneous. The testimony of Special Agent Kelly Jackson of the Internal Revenue Service detailed the source of all the payments charged in counts ten through twenty- five. This evidence, coupled with the overwhelming evidence presented at trial regarding Cabe's overall scheme, was sufficient to prove that the funds in question were criminally derived.

## C.

Cabe's final argument is that the district court erroneously used relevant conduct in determining the loss amount for sentencing purposes. In calculating Cabe's sentence, the district court found the loss to be over five million dollars. Cabe did not object at sentencing to the use of relevant conduct in determining the loss amount. Instead, he contended that it was improper to include the money seized by the government from Cabe's account in the computation of loss. However, as the district court correctly held, money returned to victims

may only be credited against loss if it is returned before the offense is detected. *See U.S. Sentencing Guidelines Manual* ("U.S.S.G.") § 2B1.1, cmt. n.2(E)(i) (2002).

Since the current basis for Cabe's objection to the amount of loss is different from that raised below, the standard of review is one of plain error. *See United States v. Wilkerson*, 84 F.3d 692, 694-95 (4th Cir. 1996). Plain error is error that is clear or obvious and affected substantial rights. *See United States v. Orlano*, 507 U.S. 725, 734 (1993). Cabe's present objection to the use of relevant conduct is that he should only be held accountable for the amounts of money he obtained through the wire fraud specifically charged in the indictment, i.e., counts one through nine, totaling $601,305. Cabe argues that it was not shown that greater amounts obtained from investors was as a result of criminal conduct.

The sentencing guidelines establish that certain relevant conduct may be considered in determining the guideline range for a criminal defendant. U.S.S.G. § 1B1.3 (2002). Relevant conduct may be based on uncharged conduct, dismissed conduct, and even conduct for which the defendant was acquitted. *See United States v. Barber*, 119 F.3d 276, 283-84 (4th Cir. 1997). In determining whether conduct is relevant,

> "the sentencing court is to consider such factors as the nature of the defendant's acts, his role and the number and frequency of the repetitions of those acts in determining whether they indicate a behavior pattern." The significant elements to be evaluated are similarity, regularity and temporal proximity between the offense of conviction and the uncharged conduct.

*United States v. Mullins*, 971 F.2d 1138, 1144 (4th Cir. 1992) (quoting *United States v. Santiago*, 906 F.2d 867, 872 (2d Cir. 1990)). When a defendant has multiple convictions for wire fraud, all acts that are part of the same course of conduct must be grouped and considered together. *See* U.S.S.G. § 3D1.2(d) (2002). Moreover, for offenses that require grouping a defendant may be held accountable for all instances of the unlawful conduct regardless of whether or not he was charged or convicted. *See* U.S.S.G. § 1B1.3, cmt. n.3 (2002).

The district court did not commit error, much less plain error, in its determination of the loss. The relevant conduct relied upon was Cabe's conduct after April 1998, a time when he was aware that the investment scheme was not as he had represented. Cabe was the leader and organizer of the scheme and was responsible for instructing stewards and managing the investment funds. Cabe's conduct, as documented in the record, involved repeated solicitation of investors through misrepresentation and deceit. Furthermore, Cabe continued to solicit funds and accept wire transfers even after his house had been searched by federal agents in August 1998. In addition to the wire transfers charged in the indictment, investors made more than one hundred wire transfers to the defendant between May and December 1998, totaling in excess of five million dollars. As estimated in the pre-sentence report, Cabe's scheme had over 210 victims, only nine of whom were specifically mentioned in the indictment.

While Cabe was only specifically charged with obtaining $601,305 by fraud, the evidence presented at trial and contained in the pre-sentence report demonstrated that he had actually caused investments of $5,759,151.18 in his fraudulent scheme. It was thus appropriate to calculate his offense level based on that amount.

### III.

For the foregoing reasons and after careful consideration of the record, we affirm Cabe's conviction and sentence.

*AFFIRMED*