**UNITED STATES of America**

v.

**Johnny William CABE, Shelton Joel Shirley.**

**No. CR. 0:00–301.**

United States District Court,
D. South Carolina,
Rock Hill Division.

June 6, 2003.

See also 57 Fed.Appx. 542.

502

Dean A Eichelberger, Anne Hunter Young, U.S. Attorneys, Columbia, SC, for United States of America.

Herbert W Louthian, Louthian and Louthian, Cameron B. Littlejohn, Jr., Columbia, SC, for Defendant.

Johnny William Cabe, Petersburg, VA, pro se.

Shelton Joel Shirley, Gastonia, NC, pro se.

ORDER OF DISTRIBUTION

JOSEPH F. ANDERSON, JR., District Judge.

This matter is before the court for a determination of the proper method of allocating seized funds to victims of an investment scheme perpetrated by the defendants in this action, Reverend Johnny William Cabe and Shelton Joel Shirley. Cabe and Shirley were charged in a multi-count superseding indictment with mail fraud, money laundering, and obstruction of justice. Shirley plead guilty to mail fraud. Cabe plead not guilty and his case was tried to a jury in July 2001. After twelve days of trial, the jury found Cabe guilty on all counts. Cabe appealed his conviction, which the Fourth Circuit Court of Appeals affirmed on March 28, 2003.[1]

The investment scheme perpetrated by Cabe and Shirley was a traditional pyramid scheme purporting to be an investment program under which individuals who contributed were promised phenomenal returns on their investments. These returns were to be generated through participation in secret international investment programs that claimed to be virtually free of risk. These funds, which were generally funneled through Cabe's ministry, known as His Way International Ministries or some variant thereof, promised in some instances returns of 100% within thirty days.

As is true with most pyramid schemes, some early investors in the scheme were repaid generous returns on their investments to lend legitimacy to the scheme and thereby attract additional investors. At trial, Cabe's defense was that the monies contributed by the investors were not investments at all; rather, they were contributions to his ministries, given with no expectation of return.

As part of the criminal proceedings against Cabe and Shirley, the government obtained an order of forfeiture seizing certain monies in bank accounts maintained by Cabe and his ministries. The monies seized and being held by the government are not sufficient to repay all of the investors who lost money in the schemes perpetrated by Cabe and Shirley. At first blush, it might appear that the fairest and most appropriate course of action would be to divide what monies are available on a pro rata basis so that each investor would receive the same percentage of his or her original investments, much as is the case in a liquidation or bankruptcy proceeding. The victims in this case, however, fall into one or more readily discernable categories based on the circumstances surrounding their investment. This court finds that these circumstances warrant an award of restitution that does not treat all categories the same.

### BACKGROUND

On August 29, 2001, the court entered a judgment and preliminary order of forfeiture as to Johnny William Cabe. This preliminary order was incorporated in the judgment in his criminal case and made final as to Cabe on October 5, 2001. Among other things, the preliminary order granted to the United States a judgment in the amount of $5,760,000. It further ordered that Cabe forfeit his interest in all property, real or personal, constituting or derived from proceeds that he obtained as a result of his violations of law. Finally, the order specifically identified funds in three bank accounts utilized by Cabe during the execution of the investment fraud scheme and ordered that the funds be forfeited to the United States. The funds in the three accounts have been seized by the United States Secret Service pursuant

---

1. For a more complete factual and procedural history of this case, see *United States v. John-* *ny William Cabe,* 57 Fed.Appx. 542, 2003 WL 159685 (4th Cir.2003).

to seizure orders issued in the course of the investigation and prosecution of this matter.

As of May 20, 2003, the United States Secret Service held $1,284,554.68 pursuant to these seizures. Additionally, on September 12, 2001, Attorney David B. Greene deposited $41,282.50 with the court's Registry (including interest, the amount now totals $42,342.38 as of May 20, 2003).[2] Evidence admitted during the trial of defendant Cabe established that these monies constituted proceeds of the scheme to defraud perpetrated by Cabe. The court therefore finds that these funds are within the scope of the forfeiture order previously entered by this court and are therefore subject to the jurisdiction of this court for further proceedings under the forfeiture laws of the United States.

In accordance with procedures established in forfeiture cases, the United States sent notice of forfeited funds and forfeiture proceedings to the last known address of victims of the scheme so that they would have the opportunity to assert interests in the funds. All claimants were required to submit written verification of their claims, and also were required to produce copies of their income tax returns for the relevant years. Additionally, the United States published a notice of forfeiture in *USA Today*. The United States received numerous claims from victims asserting an interest in the available funds.

The aggregate amount of the claims received in response to the above notifications exceeds the funds available for distribution to the claimants. This court is therefore obligated to "devise a system of equitable priority or pro ration." *United States v. Stover*, 93 F.3d 1379 (9th Cir. 1996). In devising this system, the court can consider applicable equitable principles, but it is not bound by them. The goal should be to treat each victim of the investment fraud scheme fairly and as nearly equally as is possible. This involves two separate steps. The first is to identify the persons who should participate in the distribution and to determine the amount of the cognizable claim. The second is to devise an equitable system of distribution.

On March 1, 2002, the court entered an order establishing the procedure the court would follow in apportioning the restitution. The procedure established eventually required two evidentiary hearings. The court first identified those claimants who had responded to the government's invitation for claims for whom additional documentation or information was required. These individuals were invited to a hearing before the court at which time they were allowed to supplement their inadequate responses. At the conclusion of this hearing, the court observed that disparate fact patterns existed as to some of the claimants, giving rise to the possibility that some claimants should be treated differently from others, and thus requiring a second hearing. The fact patterns fell into the following general categories:

1. Some victims were interviewed by law enforcement agents during the course of the investigation and stated that the money they sent to the defendants was a gift that was given with no expectation of return (the "gift claims"). This category of persons is limited to those who, with knowledge that the government had seized funds from accounts maintained by the defendants and that the United States was conducting a criminal investigation, made statements directly to agents of the United

---

**2.** Mr. Greene's deposit in the amount of $41,282.50 represents funds held in his law firm's trust account during the time he was retained by Mr. Cabe in connection with the investment program, prior to the criminal indictment.

States Secret Service to the effect that the money provided to the defendants was a gift and that there was no expectation of return;

2. Some victims took advantage of the tax laws and filed returns for 1998 or 1999 which reflected charitable contributions, capital losses, or casualty/theft losses attributable to monies sent to the defendants (the "deducted claims");

3. Some victims were not able to provide documentation to support their claims that they invested money with the defendants (the "undocumented claims"); and

4. Some victims received from the defendants the return of some, but not all, of the monies that they entrusted to the defendants (the "partially repaid claims").

The court then instructed the United States Attorney's office to formulate and prepare a proposed plan of distribution, identifying the funds seized, the total amount of the claims, and suggesting how and why different categories of claimants should be treated differently. In order to allow claimants whose claims were to be partially or entirely disallowed to present objections to the government's proposed plan of distribution, the court scheduled a second hearing on August 14, 2002.

After the hearing at which several claimants appeared, the United States submitted to the court a final proposal for the distribution of available monies. In addition, various claimants submitted materials directly to the court.[3] All of these materials have been reviewed and considered by the court in reaching the conclusions set forth herein.

## CLAIMS THAT ARE REJECTED BY THE COURT

As stated above, the first goal for this distribution process is to determine which claimants presented a sufficient equitable claim for money forfeited to the United States. In that regard, the court finds that the persons who told law enforcement officers that the money they sent to the defendants was a gift and that there was no expectation of return should be bound by that assertion. The court also finds that the persons who have failed to present proof of their claims cannot participate in the distribution.

It should be emphasized to these complaining claimants what the government has done for them in this case. First, the government, and indirectly the United States taxpayers, have investigated, prosecuted, and incarcerated the defendants who took advantage of them. Secondly, and more importantly for purposes of the matter before this court, the government lawyers have become *de facto* attorneys for the victims seeking to effect a *civil* recovery on their behalf. To this end, the government lawyers, investigators, bookkeepers, and accountants have spent myriad hours attempting to locate and return money illegally taken by Cabe and Shirley. Any of the claimants could have retained their own private attorney to pursue a civil action against the wrongdoers in this case.

3. Subsequent to the August 14, 2002 hearing at which the court expressed its tentative conclusion that some claimants would not receive all the money to which they believed they were entitled, the court has received a number of *pro se* submissions from some claimants, many of which were not served upon the government. In spite of this, the court has reviewed in detail each of these *pro se* submissions. The court is compelled to observe that many of these submissions are quite vitriolic in their characterization of the United States government, its law enforcement agents, and the prosecutors who handled this case. Indeed, some claimants have suggested that this court should order the Federal Bureau of Investigation to investigate the Office of the United States Attorney for the District of South Carolina for its involvement in attempting to return at least a portion of the money to the victims in this case.

1. **THE GIFT CLAIMS (Persons Who Were Interviewed by Law Enforcement Officers and Stated That Money Entrusted to the Defendants Was a Gift Given with No Expectation of Return)**

During the investigation, a number of persons were contacted by law enforcement about money they sent to the defendants. Some of these people provided complete and truthful information. Others did not. Instead, they stated that they had made a gift to the defendants and that they had done so with no promise or expectation of any return. In other words, these persons supported the position taken by Cabe in defending against the charges against him: the monies were contributions, not investments.

Now that the defendants have either plead guilty or been convicted, some of these persons now contend that their prior statements were not true, but were made so that the seized funds would be returned to the defendants. Their reasoning appears to be that if the money transferred to the defendants was a gift, then the defendants did not commit fraud. If the defendants did not commit fraud, then there was no basis upon which to seize the money. If there was no basis to seize the money, then it would have to be returned to the defendants who could have then placed the money in the high-yield investment programs they were offering to begin with. Ironically, had this ploy been successful, it is apparent from trial testimony that the funds would have been lost to the defendants' investment fraud scheme and there would be no money available for distribution.

The court finds that the claimants' false statements to the investigating agents (essentially agreeing with Cabe's theory of the case) made it more difficult to conduct the investigation, delayed the completion of the investigation, enabled the defendants to defraud other people, and potentially constituted violations of the federal false statement statute—Title 18, United States Code, Section 1001. These persons should therefore not be permitted to change their story because it is in their financial interest to do so. Instead, their claims should be rejected. While it may be unfortunate that they will not participate in the distribution ordered by this court, the net effect is that persons whose actions did not give aid and comfort to the defendants will realize an incremental increase in the amount that they receive. Further, nothing in this order prevents persons whose claims are rejected from bringing a civil action against the defendants or other potentially culpable persons.

2. **THE UNDOCUMENTED CLAIMS (Persons Who Did Not Provide Documentation to Support Their Claims That They Invested Monies with the Defendants)**

The court must satisfy itself that the claim of each putative victim is a legitimate claim. Without appropriate documentation, this task is impossible. Accordingly, where claims are not supported by independent proof, this court will decline to permit participation in the distribution of available funds.

Within this category are several persons who submitted claims in which they stated that they invested through the Spirit of the Avenger Ministries, primarily through one of its agents, William Schau. All but one of these people, however, stated that they did not have any documentation to submit to the court. The Spirit of the Avenger Ministries was directed by Timothy and Robin Orth. On multiple occasions, the Orths stated to agents of the United States Secret Service and to the assistant United States Attorney who prosecuted

this case that any money sent to the defendants was a gift that was freely given and that there was no expectation of any return. Further, the Orths, on behalf of the Spirit of the Avenger Ministries, were served with a federal grand jury subpoena requiring the production of any and all documentation relating to His Way International Ministries. In a letter dated April 13, 1999, Timothy Orth responded, writing "[w]e have given freely to those that have asked, and Pastor Cabe is no exception. He has offered us nothing in return for our gifts to the ministry. *We give with no strings attached.* We do not have anything that you are seeking except the truth of God." (Emphasis added).

William Schau initially responded to the claim notification requirement by asserting that he had no documentation. He was subpoenaed to appear before this court at the August 14, 2002 hearing because he figured prominently in the submissions of persons who claimed to have invested through the Spirit of the Avenger Ministries. Schau presented a handwritten list detailing his recollections of the purported investments of others. The Schau handwritten list, therefore, is the only "documentation" submitted for all but one of the Spirit of the Avenger investors. It appears from a close review of Schau's list, however, that there are significant discrepancies between the submission of William Schau and persons who have submitted individual claims. For example, Schau stated that John Stolzfuss, Art Auchenback, Sam Greenlee, Richard Yandrsitz, and John Kucek invested with Spirit of the Avenger Ministries, however, these persons did not submit individual claims. Furthermore, on July 2, 1998, the defendants sent a wire transfer in the amount of $82,558.00 to Robin and Tim Orth on behalf of the Spirit of the Avenger. These facts make it virtually impossible to evaluate the legitimacy of this category of claims and to identify the persons who

may have already received money back. Accordingly, with the exception of Ray Heiser (who has provided documentation), the claims of all persons who invested through the efforts of William Schau, Robin Orth, Tim Orth, or the Spirit of the Avenger Ministries are hereby denied. In making this determination, the court expresses no opinion on the potential liability of William Schau, Robin Orth, or Tim Orth. Like the claimants who fall in the "gift claim" category, nothing in this order precludes a civil action against any of the alleged wrongdoers in this case.

### CLAIMS THAT ARE ACCEPTED BY THE COURT

All other claims that have been submitted to the court are accepted and will be entitled to participate in the distribution as set forth in this order. One category of claimants, however, warrants special comment.

### The Deducted Claims: (Persons who Took Tax Deductions for their Losses)

Some of the victims of the scheme to defraud claimed the money that they sent to the defendants as deductions on their 1998 or 1999 federal tax returns. Some claimed the money as a capital loss. Others claimed it as a theft/casualty loss. Finally, some claimed it as a charitable contribution. The implications of the tax treatment of the money claimed by these persons are very complex, and vary depending upon the way the money was claimed, the marginal tax rate of the taxpayer, and any reimbursement the taxpayer may receive from any source, which would include money from this court's pro rata distribution of available funds.

■ To the extent that the tax treatment claimed by these persons was permitted under the Internal Revenue Code, the court finds that they should not be barred from participation in the pro rata

distribution. The fact that other persons did not take tax deductions merely means that they failed to avail themselves of potentially available relief. The tax code, for example, provides that persons who suffer a theft or casualty loss may take a deduction subject to certain reductions. In calculating the amount of their losses, they must deduct any amount they receive as reimbursement, whether from insurance or any other source. Thus, one victim who took a theft loss as a result of money sent to the defendants and subsequently receives money from this court would have to recalculate his or her income tax liability. Similar computations would be required for persons who took capital losses or charitable deductions. In making these observations, the court does not offer any opinion as to the validity of such tax treatment. Those matters are between the taxpayers and the Internal Revenue Service.

■ Having concluded that persons who claimed tax deductions as a result of their losses with the defendants should not have that fact affect their participation in a pro rata distribution, the court must then turn to the question of how to assure that the IRS is provided with appropriate information so that the previously claimed losses can be recaptured. As part of its work in this matter, the United States Attorney's office consulted the IRS to determine how the IRS could receive appropriate information to enable it to determine the tax treatment of the distributions. The recommendation is that for each person who receives money from the pro rata distribution, and has already taken some type of tax deduction on prior tax returns, an IRS–1099 MISC form should be filed. This recommendation has the benefit of simplicity and universal application, no matter how the money invested was claimed on tax returns. The court adopts this recommendation and a 1099–MISC form will be generated for all investors who lost money and claimed some type of tax deduction as a result of the loss.

## PLAN OF DISTRIBUTION AND ADJUSTMENTS TO AMOUNTS RECEIVED BY CLAIMANTS

■ The court finds that each claimant who has submitted a properly verified claim should receive a pro rata share of the available funds. This amount should be calculated by dividing the aggregate amount of all recognized claims by the total amount of funds available for distribution. This computation produces a percentage that can then be used, in conjunction with the claim of each qualified individual, to determine the actual distribution amount. This relatively simple computation is complicated by the fact that during the course of the scheme to defraud, the defendants repaid monies to some, but not all, of the persons who had invested in the supposed high-yield investment program. It is further complicated by the fact that some of the persons who received money back then invested other funds in the defendants' scheme.

## The Partially Repaid Claims: (Persons who Received Some Return on Their Investment)

■ Two methods of dealing with these factors have been advanced to the court. One method, the "net loss method" would look only to the net loss of each victim without regard to amounts previously repaid by the defendants. The other, which is advanced by the government, explicitly factors in amounts previously repaid by the defendants. For the reasons set forth below, the court adopts the second method which will treat all similarly situated persons as equally as possible.

The money that was used to repay investors came from new investors who were falsely told by the defendants that the

investment scheme was a successful and profitable venture. Testimony during the trial of defendant Cabe established that this money was repaid for two reasons: First, to mollify the investors who were most vocal in their demands for repayment and second, to make it appear that the purported investment was paying out as promised. This would then create an appearance of success which, in the words of Mr. Cabe, would "open the floodgates" of additional investments. Not all investors who pressured the defendants were repaid. Thus, it was the actions and decisions of the defendants, not the persistence of the investors, that determined who received repayment during the scheme. Because of these facts, the court finds that amounts previously repaid to persons by the defendants should be considered in fashioning the plan for distribution of available funds.

The court further finds that persons who have previously been repaid by defendants should not be wholly barred from participating in the distribution. Rather, such persons should receive a reduced amount so that the total amount they receive (both from the distribution and from the earlier repayment from the defendants) would roughly equal the amount they would have received from a pro rata distribution had they not received any money during the scheme from the defendants.

In order to make these determinations, the amount that each person would receive from a pro rata distribution must first be determined (without regard to the previously repaid amounts by defendants).[4] Then, this figure can be compared to the amount previously repaid by the defendants. If a person has received from the defendants less than the pro rata amount calculated pursuant to this order, that person should receive funds sufficient to bring

him or her up to the pro rata amount. To the extent that the person has received an amount equal to or greater than the pro rata amount so calculated, the money previously repaid by the defendants shall be regarded as the full distribution, and that person shall receive no additional funds from the court's distribution.

A small group of persons have already received repayment from the defendants in an amount that is greater than their pro rata share as calculated herein. Under ideal circumstances, this court could require such persons to disgorge or give up the excess they received from the defendants. With the passage of time, however, these excess funds may no longer be readily available to these persons. The requirement to disgorge the excess might therefore create a financial hardship which could victimize these persons a second time. Accordingly, the court will not require persons who received a greater payment from the defendants than they would have received from the pro rata distribution to disgorge the excess.

Several investors have encouraged the court to use a net loss method of distribution. This method suggests that persons who previously received monies from the defendants should be permitted to share pro rata based solely on their net loss. A cursory review of this proposal has some appeal because it is based on the total losses suffered by each investor at the time that defendants' scheme came crashing to its inevitable demise. A closer examination of this proposal, however, reveals that it suffers from serious flaws and produces inequitable results because it ignores the illegal activities of the defendants.

---

**4.** This is actually computed by adding the total monies available, to the total monies paid by defendants to claimants, and dividing by the aggregate claims (disregarding monies paid by defendants to claimants).

The circumstances of one investor who received early returns and who appeared at the hearing to advance the net loss theory illustrates the differences between the net loss proposal and the plan of distribution adopted by this court. This investor initially invested $100,000 and received back $144,500. He later invested another $185,000 but received nothing more in return. He also paid fees to the defendants in the amount of $3,000. He thus claims a total investment of $288,000 and a net loss of $143,500. Under the net loss proposal, this investor would have a claim of $143,500 for which he would receive a pro rata distribution without reduction for monies previously received from the defendants. Applying a 46% pro rata distribution,[5] the investor would receive $66,010 on account of his net loss. This amount, added to the $144,500 already received from the defendants, would give him a total return of $210,510 on a $288,000 total investment, or a 73% recovery. Under the plan adopted by the court, on the other hand, he would have a claim of $288,000 which at 46% would yield a pro rata share of $132,480. Since he has already received $144,500 from the defendants (a 50% recovery of his total investment), his claim would be deemed satisfied by the money previously received from the defendants (but he would not be required to disgorge the excess of $12,020).

A comparison of the claim of this investor and the claim of another investor couple further illustrates the merits of the court's plan of distribution. The couple invested $360,500 and received nothing from the defendants. Therefore, under either distribution plan, they would receive the 46% recovery of their investment. As previously noted however, the net loss proponent would realize a total recovery of 73% under his proposed plan of distribution and 50% under the proposal adopted by the court. Based on the greater disparity in claims produced by the net loss method, the court simply cannot, in good conscience, endorse the net loss method.

The net loss proponent suggests that the money received from the defendants was the product of the obligation of victims to mitigate their damages. Under this line of reasoning, the distribution plan proposed by the government penalizes these efforts. This argument, however, is faulty. First, at the time the defendants repaid some of the prior investors, the investors were not aware that the defendants were perpetrating a fraud on others to obtain the money used to pay them. Thus, the actions of the investors cannot be said to have been in mitigation. This first problem is tied inextricably to the second, and more serious, problem because it assumes that the defendants were acting within their rights when they repaid *prior investors*. The net loss proponent asks the court to ignore the fact that the money came from other victims of the fraud.

Further, as previously noted, trial testimony established that these prior investors were paid for two very cynical reasons. First, the defendants wanted to mollify the most vocal of the investors. Second, and more importantly, the defendants desired to "open the floodgates" of additional investments by pointing to the generous early returns as proof that the scheme was legitimate. Thus, it was only on account of the defendants' insatiable desire for more money that anyone received any repayment at all. Those persons who were fortunate enough to receive these monies should not benefit from the

---

5. The amounts to be distributed to victims as set forth on Exhibit A, which is attached to this order, represent a 46% pro rata distribution. The actual amount of the distribution will likely be slightly higher because of interest that will be earned on deposits.

defendants' illegal acts at the expense of other claimants.

This approach finds support in case law from other circuits. In *United States v. Durham*, 86 F.3d 70 (5th Cir.1996), all but $8,803.99 of a total of $83,495.42 available for distribution was directly traceable to seven victims. Two of those seven victims, Claremont and Northernaire, laid claim to most of the traceable funds, and they understandably argued that the court should apply the equitable principle of tracing and return the identified funds to them, even though their aggregated claims amount to a minority of the total lost. The district court refused the request and ordered that these seven victims share in a pro rata distribution because "[a]llowing Claremont and Northernaire to recover from the funds seized to the exclusion of the other victims under the tracing principle would be to elevate the position of those two victims *on the basis of the actions of the defrauders*. The Court sees no justification in equity for this result." *Id.* at 72 (emphasis added). The Fifth Circuit affirmed the district court, noting that "[i]n entering a restitution order, adherence to specific equitable principles, including rules concerning tracing are 'subject to the equitable discretion of the court.'" *Id.* at 72 (quoting *In re Intermountain Porta Storage*, 74 B.R. 1011, 1016 (D.C.Colo. 1987)).

The subsequent case of *S.E.C. v. Forex Asset Management*, 242 F.3d 325 (5th Cir. 2001), presents an even clearer example of how this court is not bound to slavishly follow equitable principles. In that case, money paid by a victim of a fraudulent investment scheme was placed into a separate account by the promoter of the scheme and never commingled with funds of other investors. Despite the fact that the funds never lost their identity as property of the claimant victim, the district court included those funds within a pro rata distribution of all available funds, resulting in a significantly lower recovery for the victim who provided the segregated funds. The claimant appealed and offered arguments under receivership law, common law regarding constructive trusts, and bankruptcy law. The Fifth Circuit acknowledged that these principles were accurate, but affirmed the district court because "the district court, acting as a court of equity, was afforded the discretion to determine the most equitable remedy." *S.E.C. v. Forex*, 242 F.3d at 332.

The court finds the reasoning of these cases to be highly persuasive. It therefore adopts the plan of distribution as set forth above.

### SUMMARY

The United States Secret Service is currently holding funds that were seized in or about August 1998 during the investigation of this matter. It is hereby directed to transfer these funds and any interest earned thereon to the court Registry administered by the Clerk of Court for the District of South Carolina. Those funds, together with the funds previously deposited in the Registry by David B. Greene, shall be held by the Clerk in an interest bearing account for purposes of distribution as ordered herein. Monies distributed pursuant to the terms of this order shall be credited against the restitution obligations of defendants Cabe and Shirley as ordered in their respective criminal judgments. Finally, the court directs that the distribution pursuant to the terms of this order shall be delayed until 60 days after the filing of this order to give any dissatisfied claimant the opportunity to attempt an appeal.[6]

All persons who have filed claims with the court are identified on Exhibits A and

---

6. The court express no opinion on whether this order is appealable.

B attached to this order. Exhibit A specifies victims who have provided independent proof of their claims and whose claims have not otherwise been rejected for reasons specified in this order. Exhibit A also specifies the amount they invested, the amount (if any) that they received directly from the defendants, and the actual amount they are to receive from the distribution pursuant to this order.[7] It also indicates by check mark those persons for whom an IRS1099–MISC form should be filed as a result of previously taken tax benefits. Exhibit B specifies those persons whose claims are denied, including their claim amount and reason for denial.

The office of the United States Attorney is directed to (1) provide the Clerk of Court with a listing of the last known addresses of all persons identified on Exhibit A so that the restitution payments can be made, (2) serve a copy of this order on all persons identified in Exhibits A and B; and (3) provide information to the Internal Revenue Service regarding the designated claimants on Exhibit A so that appropriate 1099–MISC forms can be filed.

IT IS SO ORDERED.

## EXHIBIT A

The following chart sets out the total amount invested by each victim that the court finds should be given redress in this pro rata distribution. For persons who have already received money from the defendants, the amount returned is also included so that the balancing required by this order can be accomplished. Those victims with a check mark indicated in the 1099–MISC column have previously claimed tax benefits or did not provide tax returns for the affected years so that a form 1099–MISC will need to be filed with the Internal Revenue Service.

| EXHIBIT A | | | | |
|---|---|---|---|---|
| Name of Victim | Amount Invested | Repaid by Defendants | Distribution Amount | 1099–MISC |
| Mark/Ellen Anthony | 21,630 | | 9,949.80 | |
| Monica Aguilar | 10,300 | | 4,738.00 | |
| Ann B. Barnes | 36,330 | | 16,711.80 | |
| Ralph C. Bell | 41,225 | | 18,963.50 | |
| Tom Benthall | 15,000 | 8,800 | –0– | |
| Bonnie Boyd [8] | 20,000 | | 9,200.00 | |
| Henry Brim | 40,000 | | 18,400.00 | √ |
| Lynda Brim | 30,000 | | 13,800.00 | √ |
| Sherry C. Brown | 46,000 | | 21,160.00 | √ |
| F.S. Bryant | 101,500 | | 46,690.00 | |
| Andrea Calhoun | 27,835 | | 12,804.10 | |
| Robert L. Cannon | 25,750 | | 11,845.00 | |
| Thomas Carter | 20,600 | 18,600 | –0– | |
| Richard/Gloria Chavoya | 5,150 | | 2,369.00 | |
| Cathie F. Cisneros | 10,300 | | 4,738.00 | √ |
| Marty Clary | 20,600 | | 9,476.00 | |
| Alan/Donna Cody, Jr. | 176,600 | | 81,236.00 | |

7. As a result of the funds being held in interest bearing accounts, the total amounts listed in Exhibit A will fluctuate between the date of this order and during the 60–day stay period. At the end of the 60–day stay period, the court will enter a supplemental order and schedule of distribution to reflect the anticipated increased amounts from interest accrual.

8. The court is advised that Ms. Boyd is deceased. Accordingly, her pro rata share is to be paid to her estate.

EXHIBIT A

| Name of Victim | Amount Invested | Repaid by Defendants | Distribution Amount | 1099–MISC |
|---|---|---|---|---|
| Joe Connor | 55,000 | | 25,300.00 | |
| Merian I. Copenheaver | 6,205 | | 2,854.30 | |
| Ed/Margie Cornwell | 27,060 | | 12,447.60 | |
| Charlene D. Costner | 515 | | 236.90 | |
| Linda S. Crider | 14,445 | | 6,644.70 | |
| Jim/Bonnie Davies | 12,888 | | 5,928.48 | |
| Francis S. Davis, Sr. | 30,000 | | 13,800.00 | √ |
| Enrique/Felitas Diaz | 170,610 [9] | | 78,480.60 | |
| Carla Donaldson | 5,000 | | 2,300.00 | √ |
| Stacy Dougan | 20,600 | | 9,476.00 | √ |
| Wade Easom | 80,000 | 20,000 | 16,800.00 | |
| Joe Ford | 10,325 | | 4,749.50 | |
| Mildred Fowler | 5,185 | | 2,385.10 | |
| Carlos G. Garcia | 2,500 | | 1,150.00 | |
| Claudia Garcia | 10,150 | | 4,669.00 | |
| Kenar S. Gill | 26,000 | | 11,960.00 | |
| Michael Godbout | 10,300 | | 4,738.00 | |
| Ofelia Gonzalez | 12,360 | 2,000 | 3,685.60 | |
| Blanca/Donald Goodwin | 11,845 | | 5,448.70 | |
| John A. Hagins, Jr. | 288,000 | 144,500 | –0– | √ |
| Marion T. Hammond | 10,325 | | 4,749.50 | √ |
| Claudia K. Harris | 25,750 | | 11,845.00 | √ |
| Ray Heiser | 5,000 | | 2,300.00 | |
| J.L. Hibberts, Jr. | 140,500 | | 64,630.00 | |
| Robert L. Hogue | 36,075 | 92,988 | –0– | |
| Greg Holleman | 25,775 | | 11,856.50 | |
| Eddie Howard | 360,500 | | 165,830.00 | |
| Debra L. Howard | 10,000 | | 4,600.00 | |
| Judith A. Johnson | 46,350 | | 21,321.00 | √ |
| H. Eugene Johnson | 6,180 | | 2,842.80 | √ |
| W.S./Anne Marcus–Jones | 30,950 | | 14,237.00 | √ |
| Newmoon Jung, Sr. | 20,625 | | 9,487.50 | |
| Gabella Jones | 15,000 | 11,000 | –0– | |
| David/Annette Kroger | 50,000 | | 23,000.00 | |
| Andris Thomas | 10,300 | | 4,738.00 | |
| Linda L. King | 3,090 | | 1,421.40 | |
| Walter Shanks | 5,150 | | 2,369.00 | |
| Yvonne Jackson | 1,545 | | 710.70 | |
| Katina Jones | 618 | | 284.28 | |
| Gregg Keckler | 23,740 | | 10,920.40 | |
| Russell/Betty Keith | 10,325 | | 4,749.50 | |
| John A. Knapp | 20,600 | | 9,476.00 | |
| Jack L. Kohn | 5,000 | | 2,300.00 | |
| James Knorr | 41,200 | 14,650 | 4,302.00 | |
| Ron/Denise Laratta | 77,325 | | 35,569.50 | |

9. Mr. And Mrs. Diaz submitted a claim in the amount of $252,982. The documentation they submitted, however, substantiated only the lower amount of $170,640. Accordingly, the lower amount is used as the amount that will be considered by the court.

## Exhibit A

| Name of Victim | Amount Invested | Repaid by Defendants | Distribution Amount | 1099–MISC |
|---|---|---|---|---|
| Esther F. Lee | 41,200 | | 18,952.00 | |
| J.H. Linch | 25,750 | | 11,845.00 | |
| Arthur Lopez | 30,750 | | 14,145.00 | |
| James E. Martin | 38,700 | | 17,802.00 | |
| Milford Mast | 20,600 | | 9,476.00 | |
| Kathy S. Meador | 211,800 [10] | 84,000 | 13,428.00 | |
| Stephen E. McDonald | 10,000 | | 4,600.00 | |
| Angela V. Neete | 10,325 | 31,199 | –0– | |
| Betty Lou/Terry Norwood | 10,000 | | 4,600.00 | |
| Emma Norwood | 20,000 | | 9,200.00 | |
| Kim Norwood | 10,000 | | 4,600.00 | |
| Ralph Nurnberger | 61,575 | 39,248 | –0– | |
| C. Walter Pace | 77,300 | | 35,558.00 | |
| JoBell Palmer | 20,000 | | 9,200.00 | |
| Lesia Palmer | 10,000 | | 4,600.00 | |
| Lee N. Patterson | 66,950 | 88,000 | –0– | |
| Caleb Pratt | 4,000 | | 1,840.00 | ✓ |
| Jacob Pratt | 14,000 | | 6,440.00 | ✓ |
| Randy Pratt | 10,000 | | 4,600.00 | ✓ |
| Sarah Pratt | 20,000 | | 9,200.00 | ✓ |
| Sherri Pratt | 10,000 | | 4,600.00 | ✓ |
| William Price | 20,600 | | 9,476.00 | |
| John/Jennifer Price | 3,605 | | 1,658.30 | |
| David L. Purkey | 5,150 | | 2,369.00 | |
| Martha Rasche | 20,625 | | 9,487.50 | |
| Michael E. Reinhardt | 25,755 | | 11,847.30 | |
| Earnestine Reeves | 1,030 | | 473.80 | |
| Douglas/Renee Riccobono | 25,750 | | 11,845.00 | ✓ |
| Terry E. Richardson, Jr. | 10,000 | | 4,600.00 | ✓ |
| Robert Rickli | 5,150 | | 2,369.00 | |
| Patricia R. Rosamond | 25,775 | | 11,856.50 | |
| Glyn Rogers | 20,650 | | 9,499.00 | |
| Brenda/Carmen Salvatore | 5,150 | | 2,369.00 | |
| Jeff Schaeffner | 34,000 | | 15,640.00 | ✓ |
| Dennis Smith | 159,650 | 62,500 | 10,939.00 | |
| Glendal W. Stewart | 10,325 | | 4,749.50 | |
| J. Mark Taylor | 20,325 | | 9,349.50 | |
| Donnie/Rozanne Thomas | 50,000 | | 23,000.00 | ✓ |
| Mark L. Thomas | 2,060 | | 947.60 | |
| Dionicio Vasquez | 10,300 | | 4,738.00 | ✓ |
| Charles R. Vivian | 10,300 | | 4,738.00 | |
| Edgar L. Warren | 5,000 | | 2,300.00 | |
| William K. Wathen | 12,887 | | 5,928.02 | |
| E.J. Washington, Jr. | 15,450 | | 7,107.00 | |

10. Ms. Meador submitted a claim in the amount of $161,500. At the hearing held on August 14, 2002, her husband, John Meador, stated that an additional investment of $50,000 that was not reflected in the claim produced an $84,000 payout. Thus, the Meadors invested $211,500 and received $84,000 back from the defendants.

| | Exhibit A | | | |
|---|---|---|---|---|
| Name of Victim | Amount Invested | Repaid by Defendants | Distribution Amount | 1099–MISC |
| William/Geraldine Wong | 20,600 | | 9,476.00 | |
| D. Edward Young | 51,625 | | 23,747.50 | |
| Keith Zirkle | 70,625 | | 32,487.50 | |

### Exhibit B

The court has concluded that certain claims should not be included for purposes of determining a pro rata distribution. Those persons, the amount of their claims, and the basis for rejecting the claims are set forth below.

| Exhibit B | | |
|---|---|---|
| Name | Amount Claimed | Reason Claim Rejected |
| Teresa/Daryl Baine | 8,605 | Ms. Baine was interviewed on October 7, 1998, and she claimed that the money transferred to the defendants was a gift. She was also served with a grand jury subpoena and claimed to have no records. |
| Robert S. Berg | 10,300 | Mr. Berg was interviewed on December 28, 1998, and stated that the money transferred to the defendants was a gift. |
| Randy Brim [11] | 15,000 | Mr. Brim was interviewed on February 8, 1999, and stated that the money sent to His Way was a gift. |
| Thomas J. Coleman | 58,710 | On November 20, 1998, Mr. Coleman was interviewed and stated that the money he sent to His Way was a gift. |
| Neil E. Connor | 20,600 | No documentation provided. |
| Christina Dara | 5,000 | Claims to have invested through the Spirit of the Avenger church. No documentation was provided. |
| Michael/Erna Dara | 5,000 | Claims to have invested through the Spirit of the Avenger church. No documentation was provided. |
| David B. Greene | 101,500 | Mr. Greene was interviewed on January 11, 1999, and stated that the money sent to His Way was a gift. On November 18, 1999, Mr. Greene provided an affidavit claiming money he sent His Way was an investment. |
| Gerald Griffith | 73,125 | Mr. Griffith was interviewed on December 29, 1998, and stated that money sent to His Way was a gift. |
| Wesley Griffith | 56,625 | No documentation provided. Also, he received $34,275 from a person affiliated with the defendants. |
| Taras/Lasrissa Halushka | 20,000 | Claims to have invested through the Spirit of the Avenger church. No documentation was provided. |

11. Mr. Brim submitted a claim in the amount of $283,100. In the course of proceeding, it became apparent that the majority of this amount was made up of monies provided by other persons. Those persons were contacted by the United States and submitted documentation that substantiated their respective claims. Mr. Brim's personal claim in the amount of $15,000 is rejected for the reason stated.

| EXHIBIT B | | |
|---|---|---|
| **Name** | **Amount Claimed** | **Reason Claim Rejected** |
| Ronald Hogue | 415,075 | Mr. Hogue received a return of $189,753.00. On December 8, 1998, Mr. Hogue was interviewed and claimed that money sent to His Way was a gift. |
| Celia Lopez | 5,150 | No documentation provided. |
| Cesar Lopez | 22,300 | No documentation provided. |
| Donald/Nancy Miller | 5,000 | Claims to have invested through the Spirit of the Avenger church. No documentation was provided. |
| Alfred Rath | 5,000 | Claims to have invested through the Spirit of the Avenger church. No documentation was provided. |
| Russell Russo | 7,000 | Claims to have invested through the Spirit of the Avenger church. No documentation was provided. |
| Hark/Anita Schau | 25,000 | Claims to have invested through the Spirit of the Avenger church. No documentation was provided. |
| Richard Schau | 10,500 | Claims to have invested through the Spirit of the Avenger church. No documentation was provided. |
| William H. Schau | 15,000 | Claims to have invested through the Spirit of the Avenger church. No documentation was provided. |
| Cleo Smith | 5,000 | Claims to have invested through the Spirit of the Avenger church. No documentation was provided. |
| Jacob Smith | 3,000 | Claims to have invested through the Spirit of the Avenger church. No documentation was provided. |