638 S.E.2d 677

**In the Matter of David B. GREENE, Respondent.**

No. 26232.

Supreme Court of South Carolina.

Heard Oct. 31, 2006.
Filed Dec. 4, 2006.

Henry D. McMaster, Attorney General, and James G. Bogle, Jr., Senior Assistant Attorney General, both of Columbia, for Office of Disciplinary Counsel.

Desa A. Ballard, of West Columbia, for Respondent.

PER CURIAM:

In this attorney disciplinary matter, the full panel adopted the sub-panel report and the recommendation that respondent, David B. Greene, be suspended from the practice of law for nine months, with conditions, and be required to pay the costs of the proceedings. We agree with the recommended sanction.

## FACTS

In 1998, respondent unwittingly became part of an illegal pyramid scheme disguised as an evangelical ministry, known as HISway International Ministries ("HISway" or "HIM"). Respondent's involvement included (1) investing his own money with the ministry; (2) representing Rev. Johnny Cabe and HIM in a federal criminal investigation and in all other legal matters; and (3) acting as escrow agent for HIM. In the capacity of escrow agent, respondent allowed HIM to use his lawyer's trust account for deposits and disbursements after HIM's American accounts had all been frozen by the government.

Cabe eventually was convicted of 26 counts of wire fraud and money laundering.[1]  Cabe's convictions were affirmed by the Fourth Circuit in a written opinion, which was submitted as one of Disciplinary Counsel's exhibits.  From that opinion, the following facts are excerpted because they effectively explain the pyramid scheme and provide some background to this disciplinary matter:

Cabe was pastor of a small independent Baptist church in Rock Hill, South Carolina.  Beginning in January 1998 and continuing through October 1998, Cabe and another minister, Shelton Joel Shirley, solicited individuals to invest money in an investment scheme called "high yield trading programs."  They promoted the scheme as a charitable venture affiliated with a religious organization, Hisway International Ministries of London, England. . . . Cabe and Shirley told potential investors that they had contacts with "traders" who would invest their money in European bank debentures.  Some solicitations described the investments as charitable "gifts" and the return of investments as "re-gifts" and suggested that because of their charitable nature, there would be no tax consequences.

Cabe portrayed the investment programs as profitable and without risk and claimed that investors typically would double their money within thirty to ninety days of investment. . . .

Potential investors were given documents describing the lucrative nature of the scheme and prohibiting them from revealing any information relating to it.  The documents instructed that if any such disclosure occurred, the investor would forfeit the investment.  Investors were also required to pay a three percent "administration gift" fee to Cabe on every transaction.

On January 9, 1998, Cabe began establishing bank accounts in order to aggregate and aid in the transfer of investors' funds.  Upon receiving contributions from investors, Cabe wired the funds to various organizations and individuals for alleged investment.  The evidence at trial showed that these investments were in fact fictitious and

---

1.  The federal district court sentenced Cabe to 109 months' imprisonment.  Respondent was not criminally charged.

that the money was stolen by the traders. Moreover, the evidence established that $679,317 of investors' contributions were [sic] diverted to Cabe, Shirley, and their families.

In the course of their dealings with investors, Cabe and Shirley recruited "stewards" for the scheme. After making a contribution to Cabe's ministry, the stewards were tasked with recruiting other investors for the programs. In order to recruit stewards, some of whom were already investors, Cabe provided them with literature detailing the success of the programs. In return for recruiting new investors, these stewards expected to receive a portion of the profits from maturing investments.

In meetings with investors, Cabe categorically stated that none of his prior investments had faced any problems. However, beginning in April 1998, Cabe complained to the "traders" that he had not received any return on the investments and was unable to pay any of his contributors. He expressed concern that he would not only lose future potential investors, but that he also might be "sued for fraud." Even with this knowledge, however, Cabe continued to solicit investors with representations that the programs were highly profitable and risk-free.

In July 1998, after certain of the investors demanded payment of the promised return on their investments, Cabe transferred money to some of them. Cabe represented that these payments were profits from their investments in the trading programs. However, these funds were in reality from the aggregated funds of new investors. The evidence presented at trial showed that these payments to investors were made to prove the programs profitable and to encourage further investments.

. . .

Eventually Cabe and Shirley were indicted in the court below. Shirley pleaded guilty and testified for the government at trial. One of the alleged traders, Terence Wingrove, an English art dealer, also testified for the government pursuant to a plea agreement. He admitted that he had received several million dollars in investment money from Cabe.

*United States v. Cabe,* 57 Fed.Appx. 542, 543–44 (4th Cir.2003) (footnote omitted).

Respondent was drawn into the scheme through his friend, Dennis Smith, who he had known for 25 years.[2] Smith met Cabe around March 1998; Cabe explained to Smith that HIM planned to "spread goodwill internationally" by raising money through debenture trading. The profits from this international trading would be used for benevolent and religious causes, and the original "donors" would be "re-gifted" or rewarded with substantial returns. More specifically, HIM's pitch was that if a person made a "gift" to the ministry, that person's money would increase by 500%; the donor would receive 200% in return, therefore doubling the money, and the other 300% would be used for the ministry's world wide Christian missionary programs. Smith acted as a steward for HIM and stated he was taken in "hook, line and sinker." Smith testified that he believed respondent's involvement was based on respondent's trust in him.

Respondent gave $50,000.00 to HISway in May 1998. Respondent testified that his initial involvement resulted completely from his reliance on Smith's verbal representations about HIM.[3]

The Secret Service began to investigate HIM, and in July 1998, the government froze all of HIM's bank accounts. Respondent learned of this in late September 1998 at a meeting in his office attended by Smith and Roy Palmer;[4] Cabe also

---

**2.** Respondent knew Smith through their work with The Gospel Hour, a legitimate, non-profit evangelical ministry started by respondent's father, Dr. Oliver Greene. Originally a radio and tent evangelist, Dr. Greene's ministry grew quite large, and today it continues to be broadcast on the radio and is even broadcast worldwide via the internet. *See* http://www.thegospelhour.org/index.html. After his father's death in 1976, respondent took over as executive director for The Gospel Hour. He passed the bar and began practicing law in 1977.

**3.** Disciplinary Counsel submitted HIM's promotional materials which detailed HIM's "unique secured asset high yield programs," and explained "debenture trading programs" as virtually no-risk. Respondent, however, did not see the HIM printed materials prior to his investment with, or representation of, HIM.

**4.** Neither Smith nor Palmer was criminally charged in the HISway scheme.

participated in the meeting via telephone from England. Regarding the frozen accounts, it was represented to respondent that it was all "a big mistake." It was also at this meeting when respondent was asked to legally represent Cabe and HIM in the criminal investigation [5] and to act as escrow agent for HIM by using his law firm's trust account.[6]

According to respondent, Smith and Palmer presented the idea of using his trust account. Smith and Palmer told respondent that several people were owed "re-gifts" of money, but could not be paid because of the frozen accounts, as well as others who "wanted to get in on" the trading. Respondent testified that he told Cabe the following: "I will let these donors donate money to HISway and I'll let you place it in my trust account. We can get some of these other people paid back." According to Smith, however, it was specifically suggested to use respondent's trust account because it was an account that could not be frozen by the government. Smith could not recall who made this suggestion. Respondent denies knowing this was the reason he was asked to use his trust account.

On October 26, 1998, respondent's legal representation of Cabe and HIM "in all matters necessary" was memorialized in writing with the parties agreeing to a $5,000.00 retainer for respondent. Disciplinary Counsel presented evidence that respondent did not usually do criminal defense work; when questioned about why he took on the case, respondent replied that he believed Cabe was innocent and knew that if necessary, he "could always associate someone."

From September 30, 1998 to November 3, 1998, ten deposits were made into respondent's trust account related to HISway, for a total of $468,280.00. This included a $150,000.00 deposit from attorney John Hagins as well as another $50,000.00 deposit from respondent himself. Approximately 25 payments related to HISway were made from respondent's trust account between October 1, 1998, and March 24, 1999, for a total of $426,957.50 in disbursements. These payments included

---

**5.** In addition to HIM's accounts being frozen, respondent also knew that Cabe's house had been searched pursuant to a federal search warrant.

**6.** Since approximately 1991, respondent has been a solo practitioner.

$5,000.00 and $3,917.50 to respondent himself for attorney fees related to his representation of Cabe and HIM. The other expenditures were paid to various people and companies, including, for example, Cabe's Corner Store.[7] Respondent did not independently investigate who the payees were; however, he believed the money belonged to his clients, Cabe and HISway, and therefore he felt obligated to make disbursements as directed by Cabe and Cabe's designees, Palmer and Smith.

Complainant John Dill explained that Smith told him about HIM, and Dill believed he would double his money within 45 days. Dill made two $50,000.00 investments with HIM—one was made before respondent got involved and one after. The latter investment was wired directly into respondent's trust account. Dill stated that he felt that his money would be safe in an attorney's trust account and that he had a lawyer-client relationship by virtue of the wire transfer and what Smith had told him. Prior to making this second payment, Dill was required to sign a "Reaffirmation Affidavit" wherein he "reaffirmed" that any money given had been an "unsolicited donation" without any promises made.

Complainant Ann Barnes also made two payments to HISway—$11,000.00 in the summer of 1998, and $25,000.00 in fall of 1998. When Barnes was asked by Palmer for the second payment, Barnes knew the accounts had been frozen. Palmer explained that respondent, an attorney, would be handling all the money, and so Barnes sent her $25,000 payment to respondent's trust account by cashier's check. Barnes stated that based on what Palmer had told her, she believed that respondent was representing her interests. Barnes also signed a Reaffirmation Affidavit when she made her second payment.

Attorney Johnny Hagins testified that Palmer introduced him to HISway. Hagins invested $100,000.00 in March 1998, and five months later, he received $150,000.00 back. Hagins became aware that the HISway accounts had been frozen, but at a meeting he was told that the trades had been successful,

---

7. The remaining HISway money from respondent's trust account, $41,282.50, was contributed by respondent to the federal restitution fund later used to reimburse victims of the scam.

and the money was being held in a European account. In the fall of 1998, Hagins went to a meeting at respondent's office with respondent, Cabe and Shirley, and he learned that respondent would be, in Hagins' words, a "gatekeeper" for the money by using his trust account. After HIM associated with respondent, Hagins made two additional payments of $150,000.00 and $35,000.00 at the beginning of October 1998. By January of 1999, Hagins was upset he had not seen the return on his investment. Respondent, Hagins, Palmer, Smith, and Cabe again met in respondent's office, and Hagins said they told respondent they wanted him "to birddog this thing and make sure it's done right."

In March 1999, respondent began attempting to end his legal representation of Cabe and HIM. He eventually withdrew in May 1999. Although he had had several discussions as Cabe's lawyer with the Secret Service and the Assistant U.S. Attorney, he never made an appearance for Cabe in federal court. Therefore, he unilaterally withdrew as Cabe's lawyer.

Respondent met with Hagins in March 1999, and told him the money was "just about all gone." Respondent also informed Hagins that he had sent out the money as directed by Cabe, Smith, and Palmer.[8]

After Cabe's conviction, the federal district court issued an order regarding the distribution of funds that had been seized by the government to victims of the HIM fraud. Respondent himself sought some reimbursement for his losses from the federal court. He asserted in a November 1999 affidavit that his payments were investments; however, because he initially characterized his payments as gifts during a January 1999 interview with the Secret Service, he was disallowed any monetary recovery. *United States v. Cabe*, 311 F.Supp.2d 501 (2003).

### Mitigating Circumstances

Respondent testified that he never believed Cabe was involved in anything illegal and if he had suspected wrongdoing, he would not have represented Cabe. Once it became clear to

---

8. As a plaintiff, Hagins (along with Barnes) brought a civil lawsuit against Cabe, respondent, and others, and eventually the matter was settled by respondent's malpractice carrier for $60,000.00.

him that Cabe was unwilling to assist the government's case and there had been an illegal scheme, he began to withdraw as Cabe's lawyer. In an attempt to explain why he was duped, he told the panel that he believed HIM to be an international ministry governed by a blind trust and the money was going to be used for "eleemosynary purposes and Christian endeavors." He had seen his own father run a legitimate ministry and raise money for a hospital in Africa. He stated he had no criminal intent.

Additionally, respondent's older brother, attorney Tom Greene, testified before the panel. Tom, a former Greenville solicitor and former legislator, stated that his brother is "somewhat gullible." Respondent also presented several witnesses who testified or submitted affidavits regarding his good character and reputation as a lawyer.

Finally, respondent has no disciplinary history in almost 30 years as an attorney. He cooperated with the federal investigation after he withdrew as Cabe's lawyer, and also cooperated with disciplinary counsel. He turned over the remaining HIM money in his trust account to the federal restitution fund.

## DISCUSSION

The full panel decided respondent had engaged in misconduct and recommended that respondent: (1) be suspended from the practice of law for nine months; (2) pay the costs of the disciplinary proceedings; and (3) be required to take CLE courses regarding the proper use of trust accounts. Respondent raises 18 exceptions to the report.[9] While we agree with respondent that the evidence does not support all the rule violations found in the report,[10] we nonetheless find respondent committed misconduct and impose the recommended sanction.

---

**9.** Respondent contends, *inter alia*, the Panel erroneously: (1) applied a "knew or should have known" standard to the facts, and (2) imputed Cabe's intent to use respondent's trust account for illegal purposes to respondent.

**10.** Unlike the panel, we do not find respondent violated Rules 1.1, 1.2(d), 1.13(d), 1.16(b), and 8.4(b) & (c), of the Rules of Professional Conduct, Rule 407, SCACR.

216

■ The authority to discipline attorneys and the manner in which the discipline is given rests entirely with this Court. *In re McFarland*, 360 S.C. 101, 600 S.E.2d 537 (2004); *In re Long*, 346 S.C. 110, 551 S.E.2d 586 (2001). A disciplinary violation must be proven by clear and convincing evidence. *E.g., In re Chastain*, 340 S.C. 356, 532 S.E.2d 264 (2000). This Court is not bound by the sub-panel's recommendation; instead, after a thorough review of the record, the Court may make its own findings of fact and conclusions of law, and it must impose the sanction it deems appropriate. *In re McFarland, supra; In re Strickland*, 354 S.C. 169, 172, 580 S.E.2d 126, 127 (2003); *In re Chastain, supra.*

■ It is clear to us that respondent committed professional misconduct by allowing Cabe and HIM to utilize his trust account with the knowledge that HIM's American bank accounts had been frozen as part of a federal criminal investigation. This was a serious lapse in professional judgment which amounted to conduct "involving . . . fraud" as well as conduct that was "prejudicial to the administration of justice." Rules 8.4(d) & (e), of the Rules of Professional Conduct, Rule 407, SCACR; *see also* Preamble: A Lawyer's Responsibilities, Rule 407, RPC ("A lawyer, being a member of the legal profession, is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice.").

■ In addition to violations of Rules 8.4(d) & (e), RPC, we find that respondent also violated: Rule 1.8(a), RPC (conflict of interest, by entering into the business transaction with HIM while representing Cabe and HIM without the client's written consent); and Rule 8.4(a), RPC (it is professional misconduct to violate the Rules of Professional Conduct).

■ Likewise, we find there clearly are grounds for discipline in this matter. *See* Rules 7(a)(1) & (5), RLDE ("It shall be a ground for discipline for a lawyer to: (1) violate . . . the Rules of Professional Conduct, Rule 407, SCACR," and "(5) engage in conduct tending to pollute the administration of justice or to bring the courts or the legal profession into disrepute or conduct demonstrating an unfitness to practice law.")

Accordingly, we order that respondent be definitely suspended for nine months and take CLE courses regarding the proper use of trust accounts. In addition, respondent shall pay the costs of these disciplinary proceedings. Within 15 days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30, RLDE, Rule 413, SCACR.

**DEFINITE SUSPENSION**

TOAL, C.J., MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.